92 N.Y.2d 141 (1998)
699 N.E.2d 872
677 N.Y.S.2d 248
In the Matter of Lorin M. Duckman, a Judge of the Criminal Court of the City of New York, Kings County, Petitioner. State Commission on Judicial Conduct, Respondent.
Court of Appeals of the State of New York.
Argued April 28, 1998
Decided July 7, 1998.
Ronald G. Russo, New York City, and Richard W. Levitt for petitioner.
Gerald Stern, New York City, Robert H. Tembeckjian and Jean M. Savanyu for respondent.
Russell M. Gioiella, New York City and Thomas H. Burt for New York Criminal Bar Association, amicus curiae.
Scott H. Greenfield, New York City, for New York State Association of Criminal Defense Lawyers, amicus curiae.
Chief Judge KAYE and Judges SMITH, LEVINE, CIPARICK and WESLEY concur in Per Curiam opinion; Judge TITONE dissents and votes to reject the determined sanction in a separate opinion; Judge BELLACOSA dissents and votes to reject the determined sanction in another dissenting opinion.
*143 Per Curiam.
The State Commission on Judicial Conduct has determined that petitioner, since April 1991 a Judge of the Criminal Court of the City of New York (Bronx County, 1991-1994; Kings County, 1994-1996), engaged in various acts of misconduct demonstrating a pattern of injudicious behavior that renders him unfit to continue in office. Given petitioner's acknowledgment before us of many of the alleged acts of wrongdoing, the central issue on his appeal to this Court is one of appropriate sanction: should he be removed from office or censured? Like the Commission, we conclude that removal is the appropriate sanction.

I.
In a Formal Written Complaint dated June 5, 1996, the Commission charged that petitioner had willfully disregarded the law, displayed intemperate demeanor, abused the power of his office and exhibited bias against the prosecution. With 363 specifications, the Complaint made two formal charges. Charge I asserted that between October 1991 and February 1996 petitioner
"in the exercise of his judicial duties, willfully disregarded provisions of law that resulted in the improper dismissal of criminal charges, delivered ad hominem criticisms and injudicious lectures to assistant district attorneys that unfairly attributed to them improper and harsh values and judgments in their role as prosecutors and made intemperate, derisive and otherwise inappropriate comments to *144 assistant district attorneys. * * * [B]y reason of the foregoing, [petitioner] abused the power of his office, displayed evident bias against the prosecution, and acted in a manner inconsistent with and prejudicial to the fair and proper administration of justice."
Charge II alleged that between May 1992 and December 1995, petitioner engaged in certain specific acts of "intemperate and injudicious conduct." Petitioner denied all wrongdoing.
On November 6, 1996, Matthew J. Jasen, appointed by the Commission as Referee, commenced hearings that continued over a period of 20 days. The evidence included the testimony of 67 witnesses (29 for petitioner, 38 for the Commission), consuming more than 4,000 transcript pages, and 200 exhibits. In addition, the record before us includes a "Book of Letters," 112 letters largely from practitioners who appeared before petitioner  both as prosecutors and as defense counsel  attesting to his personal and professional qualities.
On May 28, 1997, the Referee filed his Report, a 157-page document summarizing in detail the evidence with respect to each alleged act of misconduct, annotated to the record (for the most part transcripts of court proceedings conducted by petitioner, and petitioner's own testimony).
In his "Findings of Fact" the Referee found that petitioner had committed all but one of the acts of misconduct charged (he sustained all but five specifications; two were withdrawn by the Commission). As "Conclusions of Law" the Referee determined that petitioner had violated the State Constitution, as well as specified provisions of the Code and Rules of Judicial Conduct. He further rejected the notion that it is common practice for Judges of the Criminal Court to engage in the misconduct found, and even if it were, each Judge individually "must abide by the ethical standards required of judges in the unified court system, and neither calendar congestion nor a judge's frustration excuses or mitigates the pattern of misconduct reflected in these findings of fact and conclusions of law." Finally, the Referee concluded that petitioner's "expressed belief in the propriety of his undisputed conduct, as set forth in the findings as to Charge [II], demonstrates a failure to recognize that such conduct was improper, and a failure to appreciate the proper roles of a Judge and a prosecutor in the criminal justice system."
*145 Commission counsel then moved to confirm the Report and for a determination that petitioner be removed from office. Petitioner opposed the motion.
Petitioner waived confidentiality and on September 11, 1997, the Commission heard oral argument in a public session, at which both petitioner and his counsel appeared. Thereafter, the Commission considered the record of the proceeding and made findings of fact, concluding that petitioner violated several provisions of Canons 1, 2A and 3 of the Code of Judicial Conduct as well as the Rules Governing Judicial Conduct. Charges I and II were sustained insofar as they were consistent with the Commission's findings (several additional specifications of the Commission's complaint were not sustained), petitioner's misconduct was deemed established, and the Commission held that petitioner should be removed from office. A 50-page Appendix to the Commission's Determination describes each of the specifications of misconduct found by the Commission.
All 11 members agreed that petitioner had engaged in serious misconduct by his knowing disregard of the law and by his intemperate, disparaging name-calling of young prosecutors and insensitive remarks. The Commission, however, issued five separate opinions, and it split seven-to-four on the issue of sanction. While the seven members agreed unanimously on the wrongdoing warranting removal, three would have gone further in their findings  two members underscoring petitioner's "consistent and outrageous disregard of the law," and a third underscoring "the gravity of the misconduct found with respect to Charge II" and the fact that petitioner "repeatedly made inappropriate comments concerning gender and race which are antithetical to the role of a judge." Of the four Commission members who voted for censure rather than removal, one expressed the view that "a jurist who has sat on over 50,000 cases should not be removed for misconduct in only 19 cases." The other three, while agreeing that petitioner had committed serious judicial misconduct, asserted that, given all of the facts and circumstances, the appropriate sanction was censure.
After careful review of the evidence, we conclude that the Commission's determination sustaining the charges is supported by a preponderance of the evidence and that the sanction of removal is warranted (NY Const, art VI, § 22; Judiciary Law § 44).

*146 II.
In our view, the credible evidence  indicating wrongdoing both in connection with case dispositions and in court proceedings generally  was sufficient to support the Commission's findings of misconduct. Given the voluminous record, as well as the extensive factual digests already set forth both in the Commission's Determination and in the Referee's Report,[1] we will not particularize all of the individual incidents but instead will more broadly indicate the categories of misconduct into which they fall.
Misconduct in Connection with Case Dispositions: Largely consisting of transcripts of court proceedings before petitioner, the evidence establishes that petitioner willfully disregarded the law in disposing of the criminal charges in 16 cases: 13 dismissals for facial insufficiency, one purportedly in the interests of justice, and two adjournments in contemplation of dismissal (ACDs). Cases were dismissed without notice or an opportunity for the prosecution to be heard, without allowing an opportunity to redraft charges, without requiring written motions, and in the case of ACDs, without the consent of the prosecutor. What is significant for present purposes is both that petitioner dismissed these cases in knowing disregard of requirements of the law (see, e.g., CPL 140.45, 170.30, 170.35, 170.40, 170.45, 170.55, 210.45), and the abusive, intemperate behavior he manifested in dismissing those cases, at times not permitting the attorney to make a record of an objection either to the disposition or in response to the accusations.
In the overwhelming number of these cases it is clear that petitioner dismissed accusatory instruments for facial insufficiency because the prosecutor refused to agree to petitioner's requests for an ACD or to offer a plea to a violation. In others, petitioner simply believed that the cases should not be prosecuted. Petitioner explained to the Commission that "there were times where [he] did things in the interests of justice, using the guise of facial insufficiency" to dispose of a case when he "thought it was right to do it." In his words:
"Sometimes in an effort to do justice, I used the vehicle of dismissals for facial insufficiency without *147 making defense attorneys put their motions in writing, without giving the people an opportunity to amend or redraft, and sometimes without giving the people an opportunity to be heard fully."
Illustratively, in one case where defendant was charged with menacing in the third degree for pointing what appeared to be a gun at children, at arraignment petitioner told the prosecutor "it's an ACD or it's dismissed." Petitioner refused to allow the prosecutor to present his argument as to why the accusatory instrument was in fact facially sufficient, denied his request that the dismissal motion be in writing and, after warning him not to "just come up with some nonsense and tell me you want the opportunity to redraft," petitioner denied the prosecutor's request to rewrite the accusatory instrument. Petitioner also cautioned the prosecutor that he should "ACD and maintain the peace." When the prosecutor refused, petitioner dismissed the charge on concededly improper grounds. The prosecutor's reply, "Over the People's objection," evoked the following diatribe:
"THE COURT: Please don't say that. It's not over your objection. My objection is that you can't stand here and act like a lawyer. How are you going to proceed in this case? It's not over your objection. You are supposed to come into court  don't smile, put that down and look at me  I said to look at me, Mr. Petrillo. I am going to tell you what offends me. I tell you fifty times, it's not over your objection, you are given an opportunity to be heard. When you can't make out the charges, the charges are dismissed. These are people's lives. Based on that nonsense, you had a person go to jail. What am I supposed to say to you, about the lack of respect that I have for you prosecuting a person, when you don't have a case? You don't have an objection. You are just mouthing some words that somebody told you, for no reason, and insulting me, and I am insulted and I don't want to hear it again.
"MR. PETRILLO: I did not intend to insult 
"THE COURT: Did I ask you to talk; did I? You told me it was over your objection, and I am telling you what my objection is and I speak last. He does it all the time, and you do it all the time and lawyers *148 don't do that. They stand up here and do what they are supposed to do. You can't come up here, with a facially insufficient complaint, and say `we are moving to dismiss or we are ACD'ing it.' It's too bad we don't have more who do. The case is over. I am not listening to you. Move away. Next case. Don't do it again. If you smile, you are going to find out what power I really have. Do you understand that? Do you understand that; yes or no?
"MR. PETRILLO: Yes, I do."
A transcript from another case reflects a similar colloquy between petitioner and two prosecutors:
"THE COURT: You want to ACD? Dismiss or ACD. That is your choice.
"MR. SACK: Judge I am not prepared to do either right now.
"THE COURT: You have a reason for that? Is there something I said  that was wrong?
"MR. SACK: Judge, I am reviewing the write-up.
"THE COURT: I think I gave you five minutes to look at it and  Ms. Rice, you have a problem? Stand up. I didn't ask you to talk.
"MS. RICE: Do I have a problem, your Honor?
"THE COURT: I didn't ask you to talk. Then leave the courtroom and solve your problem.
"MS. RICE: You want me to leave now?
"THE COURT: Don't you shirk and give me weird looks, okay.
"MS. RICE: I apologize, your Honor, if I gave 
"THE COURT: Here we go again. You want to dismiss or ACD the cases, Mr. Sack?
"MR. SACK: Judge, I see that a count is not charged. I therefore, with the Court's permission, move to add that to the Complaint at this time 
"THE COURT: Your application is denied. You charged him with this. ACD or dismiss. If you want to rearrest *149 him or go, go to their houses and charge them with the Administrative Code violation. Are you ready to do it?
"MR. SACK: With all due respect, your Honor, the factual allegations in the complaint do make out 
"THE COURT: Didn't I just dismiss your application? You want me to  you want to say it five more times? When I ask you and I rule that is it. Go on to the next point.
"MR. SACK: My next point, Judge, is to ask for bail.
"THE COURT: Charges dismissed. Good day."
Apart from knowingly disregarding procedural requirements of the law to reach his desired result, petitioner on his own dismissed a drunk driving prosecution, over the prosecutor's objection, where he thought a conviction would be unlikely,[2] and assumed facts where his own life experience suggested police misconduct. Court transcripts, for example, show petitioner in one case surmising that "defendant had taken a beating for causing two police officers to chase him for three blocks." There having been no prior mention of a beating in the transcript, during the hearing before the Referee petitioner explained that his belief was based on the fact that defendant "looked rather disheveled."
Again, in another proceeding, petitioner speculated on the record: "Somebody in a car with a gun, police officer goes to the car and they don't move  the cops then try to do something to get them out * * * [w]hat they did to get them out of the car, whether they were abused, grabbed, hit, berated." And in yet another, where defendant was charged with obstructing governmental administration and disorderly conduct based on allegations that he had interfered with his brother's arrest, court transcripts indicate that petitioner insisted that the prosecutor agree to an ACD. When the prosecutor refused, petitioner asked defense counsel for a motion and dismissed *150 the charges. In response to questioning before the Commission, petitioner admitted that he did not give proper notice before dismissing the charges, but it was his opinion that defendant only pushed the officer to protect his brother from injury. He knew his view was the correct one because he had "talk[ed] to a lot of people" and had heard from defense counsel "what was going on here." Petitioner explained: "I read things into cases and I'm not wrong about these things."
In yet another matter, the accusatory instrument charged defendant with assault in the third degree and harassment based on allegations that defendant "struck [the victim] with closed fist in the face, causing swelling and bruising to the face and to suffer substantial pain and to be alarmed." Petitioner argued that the prosecutor did not allege facts to make out an assault and described the alleged punch in the face as a "push": a "push is not an assault * * * It's harassment." After defendant pleaded guilty to harassment, petitioner asked defense counsel whether he wanted to move to dismiss the assault charge. Although the prosecutor argued that the victim "received swelling and bruising to the face" and suffered pain, petitioner rejected the prosecutor's argument as a "conclusion," and dismissed the misdemeanor assault for facial insufficiency.
In addition, petitioner knowingly disregarded statutory requirements in dismissing charges in the interest of justice, and twice imposed an ACD without the consent of prosecutors, berating them in the process. For example, the dismissal in the interest of justice involved a charge of theft of services for allegedly entering the New York City subway, in the Bronx, without paying a fare; defendant at the time had a similar charge pending against him in New York County, and four prior class A misdemeanor convictions. When the prosecutor refused petitioner's request for a plea to disorderly conduct, with time served, petitioner lectured her about the need for jobs and health care, said she was not "doing justice" and was being "unreasonable" and dismissed the case, in knowing disregard of the requirements of a written motion for such relief and reasons for such dismissal set forth on the record (see, CPL 210.45, 170.40, 170.45).
Misconduct in Court Proceedings Generally: The 16 cited instances of knowing disregard of the law are not the only credible evidence supporting the charges. Well beyond those proceedings, the Commission documented instances of petitioner's inappropriate behavior in his dealings with persons appearing before him, demonstrating impatience and intolerance, *151 even at times ordering prosecutors who disagreed with him out of the courtroom.
Petitioner, for example, subjected prosecutors to harsh, personal criticisms when they would not accept his view as to the "worth" of a case. Petitioner admitted to the Commission that he chastised prosecutors for their bail recommendations because he did not want to be criticized for setting low bail. As one prosecutor reported in testimony before the Referee, after his bail recommendation petitioner accused him of "making him look bad in front of the audience." Petitioner asked another prosecutor if her bail recommendations were the "result of [her] middle-class background"; another was criticized as "too lofty" to appear in his court; another as having "no guts." Petitioner's lectures about the unfair actions of "your society" or "your government" at times elicited laughter or applause in the courtroom.
Petitioner conceded that on several occasions he made derisive remarks in open court referring to prosecutors' allegiance to their office policies, calling them "good little soldiers," "good little soldier boys," "mannequins" and "puppets," or commenting that they were "earning another stripe on the arm" or "notch on the belt" every time they put someone in jail. In open court, he called them nicknames, such as "Princess" or "Princess Nancy," "Mr. Nuisance," and "Marshal Dillon" or "the Marshal." As lawyers testified, they felt belittled, degraded and demeaned by petitioner's open-court sarcasm and ridicule.[3]
In the case of one prosecutor who is visually impaired, petitioner heatedly accused him of having broken his lectern by leaning on it. Petitioner, who was admittedly "distraught," "upset," "shocked" and "dismayed" by the damage to the lectern, told the prosecutor that he would "teach" him "how to properly stand up in court." Petitioner concedes that his law clerk "calmed [him] down" by assuring him that the lectern could be fixed. A year later, when petitioner ran into the *152 prosecutor after business hours at a restaurant bar near the courthouse, he said in a manner that was "not kidding" or "jovial"  "he's the one who broke my lectern."
Petitioner told one female prosecutor that she was "too sexy" to wear flat shoes and that she had "nice legs" (petitioner denied the first comment but acknowledged the second); he admittedly told another that she looked better in shorter skirts. In a case involving two African-American women, court transcripts reveal that petitioner, attempting to explain to a prosecutor why his disposition of the case  an ACD  was appropriate, stated: "At the risk of sounding racist and sexist, [the case] is really just two women, and you know sometimes certain things are just cultural." While petitioner strongly denies any racist or sexist bias, he admits making "isolated statements" which he characterizes as "aberrational in character," reflecting a familiarity not appropriate to his position.[4]
Incidents such as these, plainly inappropriate behavior for any Judge, are multiplied throughout the evidence and persuade us that the charges have been sustained.

III.
Having concluded from the proven facts that petitioner willfully disregarded the law, abused the power of his office and engaged in injudicious behavior, we reach the crux of the present appeal: whether removal or public censure is appropriate (see, NY Const, art VI, § 22 [d]). We agree with the Commission that petitioner should be removed.
"[T]he purpose of judicial disciplinary proceedings is `not punishment but the imposition of sanctions where necessary to safeguard the Bench from unfit incumbents'" (Matter of Reeves, 63 N.Y.2d 105, 111, quoting Matter of Waltemade, 37 NY2d [a], [lll]). The actual levels of discipline to be imposed by the Court for judicial misconduct are, in the end, "institutional and collective judgment calls" (Matter of Roberts, 91 N.Y.2d 93, 97). They rest on our assessment of the individual facts of each case, as measured against the Code and Rules of Judicial Conduct and the prior precedents of this Court.
*153 Not surprisingly, in the intensely fact-specific inquiry before us the parties differ in their view of the more analogous precedent. Petitioner urges us to look to Matter of LaBelle (79 N.Y.2d 350), where the Court concluded that the Commission had overstated both the number and the nature of petitioner's transgressions regarding commitments without bail and then rejected the determined sanction of removal in favor of censure. The Commission, in contrast, considers more pertinent Matter of Sardino v State Commn. on Judicial Conduct (58 N.Y.2d 286, 292), where the Court upheld a determination that the individual under review had "`so distorted his role as a judge as to render him unfit to remain in judicial office'."
While finding no four-square precedent  each judicial misconduct appeal truly stands on its own facts  we note that several of petitioner's arguments are analogous to arguments made by the Judge, and ultimately rejected by this Court, in Sardino (see also, Matter of Reeves, 63 NY2d at 110-111, supra). We underscore, however, that this case is neither Sardino nor LaBelle.
Like petitioner here, Judge Sardino argued that he in fact felt no bias, nor was he motivated by animosity or self-interest. As this Court observed, however, the perception of impartiality is as important as actual impartiality: Judges must conduct themselves "in such a way that the public can perceive and continue to rely upon the impartiality of those who have been chosen to pass judgment on legal matters involving their lives, liberty and property" (Matter of Sardino v State Commn. on Judicial Conduct, 58 NY2d at 290-291, supra; see also, Code of Judicial Conduct Canon 2 [A]; 22 NYCRR 100.2 [a "judge shall avoid impropriety and the appearance of impropriety in all of the judge's activities"]; 22 NYCRR 100.2 [A] [a "judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary"]).
Similarly, petitioner in Sardino argued unsuccessfully that the number of abuses  62 over a two-year period  should not be viewed in isolation from his seven-year career on the Bench. As the Court noted, the number of abuses was not insignificant and, if viewed in the context of Sardino's entire career, would at best "establish that his behavior was erratic, which itself is inconsistent with a Judge's role" (58 NY2d at 291, supra). Here, too, petitioner urges that we credit his otherwise unblemished performance in a high-stress, high-volume court. The Court, however, has resisted any numerical yardstick for determining *154 unfitness (see, Matter of Hamel, 88 N.Y.2d 317; Matter of Esworthy, 77 N.Y.2d 280; Matter of VonderHeide, 72 N.Y.2d 658; Matter of Sims, 61 N.Y.2d 349). Rather, it must be the nature of the proven wrongdoing as well as the numbers that determine the appropriate sanction.
Moreover, in Sardino, as we do here, the Court questioned the veracity of the argument that many other Judges engaged in similar misconduct and concluded that, in any event, such evidence would be irrelevant. "Each Judge is personally obligated to act in accordance with the law and the standards of judicial conduct. If a Judge disregards or fails to meet these obligations the fact that others may be similarly derelict can provide no defense" (Matter of Sardino v State Commn. on Judicial Conduct, 58 NY2d at 291, supra; see also, Code of Judicial Conduct Canons 1, 3 [A] [1]; 22 NYCRR 100.1 [a "judge should participate in establishing, maintaining and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved"]; 22 NYCRR 100.3 [B] [1]). Nor are Judges, in the interest of alleviating regrettable court congestion  or indeed, even in the interest of empathy for defendants  free to ignore the law in order to weed out cases they personally feel are unworthy of prosecution or clogging the system.
Petitioner's contention that his harsh treatment of young prosecutors was simply a consequence of his efforts to educate them to be more just is similarly unavailing. As the Commission noted: "[t]eaching need not involve angry screaming and humiliating invective and is not effective when the lesson is that a judge may abandon the law and abuse judicial authority."
Of significant concern as well  and particularly relevant to the question of appropriate sanction  is petitioner's refusal, throughout the Commission's initial investigation and the proceeding before the Referee, to acknowledge the impropriety of his behavior in wrongfully dismissing cases (see, Matter of Aldrich v State Commn. on Judicial Conduct, 58 N.Y.2d 279, 283; Matter of Sims, 61 N.Y.2d 349, 356; Matter of Shilling, 51 N.Y.2d 397). As petitioner made clear in his testimony, he believes dispositions made in contravention of CPL requirements are permissible if they serve his definition of justice or conserve court resources by removing unworthy cases from an overburdened calendar. Testifying before the Referee, petitioner explained: "I think about what cases should be in this system *155 and which cases shouldn't be in the system, and I think judges get to make that decision, and * * * if somebody comes and brings it to your attention and complains or asks you to do something, you can do something about it."
When petitioner was questioned before the Commission and the Referee about his handling of a number of cases, he was reluctant to acknowledge that the CPL required him to allow prosecutors to amend facially insufficient accusatory instruments. Even more troubling, however, are the numerous instances when petitioner testified that he had not abided by the CPL's amendment and notice requirements in disposing of a case, but still maintained that he had not been wrong in doing so. For example, petitioner explained before the Referee that although he "may have been wrong in reaching the decision [to dismiss in People v Shaw]," he believed that he "still did the right thing." Similarly, when petitioner was questioned during the hearing about People v Zhao  a case which he later acknowledged he "should not have dismissed"  petitioner refused to admit that he had not acted in accordance with the law in disposing of the matter. Instead, petitioner insisted that his "legal ruling was correct." In People v Samuels, although he admitted to dismissing the charges "for the wrong reason," petitioner again refused to acknowledge before the Referee that he had not handled the matter in accordance with the law.[5]
Additionally, with regard to several instances of clearly intemperate behavior, petitioner refused to admit that his comments were inappropriate. For example, petitioner testified during the hearing that he does not consider his asking a prosecutor whether he got his law license "on the back of an orange juice carton" to have been insulting. Moreover, despite *156 considerable evidence to the contrary, petitioner maintained that his courtroom "was always run with courtesy."
In making the difficult choice between censure  returning petitioner to the Bench  and removal, we find these examples particularly pertinent when combined with the numerous instances when Bureau Chiefs or Chief Assistant District Attorneys of Bronx and Kings Counties spoke with petitioner about his loss of temper and demeaning treatment of prosecutors who appeared before him. Petitioner sometimes acknowledged the inappropriateness of what he had done and said he would try to calm down, yet the misconduct continued. This evidence  not mentioned by the Commission's dissenters  suggests that the confirmed findings of improper conduct are not isolated, acontextual, subjective instances, and it supports the inference that petitioner lacks the insight and self-control to make fundamental changes in his attitude or judicial temperament.[6]
The foregoing leads us to conclude that the Commission has not, as in LaBelle, overstated the seriousness of petitioner's wrongdoing. Rather, the substantial record of petitioner's intentional disregard of the requirements of the law in order to achieve a personal sense of justice in particular cases before him, coupled with the substantial record of improper courtroom conduct and unresponsiveness to concerns flagged for him, persuade us that removal is the appropriate sanction.
Finally, we note several weighty concerns voiced by petitioner, by the dissenters and by amici relating to the origin of the Commission's investigation. The investigation was triggered not by appeals or complaints of wronged litigants or lawyers, but by a firestorm of public criticism generated by a separate tragedy, as to which, in the end, petitioner's rulings were found to be a proper exercise of judicial discretion, not a basis for discipline. As petitioner points out, but for that tragedy  as to which he has been fully exonerated  likely no charges would have been lodged against him. There is, moreover, the deeply troubling suggestion  not established on this record  that prosecutors kept a "dossier" on petitioner, microscopically tracking him.
These concerns, which we share, center on a threat to the independence of the judiciary, a cornerstone of our democracy, *157 posed by unwarranted criticism or the targeting of Judges. Judges must remain free to render unpopular decisions that they believe are required by law. Valid and vital though these concerns surely are, the difficult issue that confronts us in this matter is how to sanction the serious misconduct  now fully documented before us  that the firestorm has exposed. Plainly, wrongdoing in connection with initiating an investigation could not insulate an unfit Judge; any such wrongdoing must be otherwise redressed. We are satisfied that in this particular case removal, rather than censure, does not imperil the independence of the judiciary. Indeed, on the merits of this case, the judiciary, the Bar, and the public are better served when an established course of misconduct is appropriately redressed and an unfit incumbent is removed from the Bench.[7]
Accordingly, the determined sanction of removal should be accepted, without costs.
TITONE, J. (dissenting).
By accepting without qualification the harsh sanction of removal for Judge Duckman's indiscretions, the majority has sent a message that the State's judicial disciplinary procedures are susceptible to manipulation by public officials and that Judges whose rulings displease those public officials may find themselves singled out for exceptional, and possibly ruinous, scrutiny. Because the outcome in this case strikes at the heart of the notion of judicial independence which is so critical to our tripartite system of government, I feel compelled to express my dissenting views.
The instant disciplinary proceeding did not begin in a vacuum, and its outcome cannot be assessed without reference to the political maelstrom that generated it. It is clear from the public record that petitioner was targeted for investigation and formal discipline because of the publicity he received in connection with a routine bail decision he made in a misdemeanor prosecution involving one Benito Oliver. Some three weeks after his release on bail, Oliver located his former girlfriend, *158 Galina Komar, shooting her and then himself. The following day, the incident was reported by the New York City tabloids in sensational headlines which implied that petitioner was somehow to blame for the tragic incident. One tabloid blared a headline indicating that petitioner had said "[e]ven I beat my wife"  a remark that he never actually made.
The lurid newspaper coverage was followed only a few days later by a letter from the State Senate Majority Leader to the State Commission on Judicial Conduct demanding that petitioner's fitness be investigated immediately. At the same time, Governor Pataki initiated his own "investigation" of petitioner. These actions by two of the State's most powerful elected officials were part of a larger political climate in which Judges were increasingly being scapegoated. Beginning around the time of the Komar killing and continuing throughout the spring and fall of 1996, journalists specializing in sensational reportage and politicians anxious to capitalize on public fear combined to lay the blame for urban crime at the feet of "criminal coddling" Judges (see generally, Goshko, Accusations of Coddling Criminals Aimed at Two Judges in New York, Wash Post, Mar. 14, 1996, at A3; Olch, Soft on Crime? Not the New York Court of Appeals, NYLJ, May 6, 1996, at 1, col 1; Reske, ABA Commission Defines Areas of Judicial Independence, 82 [Dec. 1996] ABA J, 99; Reske, Pointed Resignation Judge Blasts Politicization of Judiciary, 82 [July 1996] ABA J, 40; Seymour, Jr., Defending the Judiciary  An Open Letter to the Bar, 38 [No. 2] NY St Bar Assn  St Bar News, at 1, col 2 [Mar./Apr. 1996]; Spencer, Protection Order Abuse Elevated to Felony, NYLJ, Aug. 9, 1996, at 1, col 3).
As the onslaught from the media continued, the Governor's office sent representatives to the Kings and Bronx County District Attorneys offices, apparently to obtain additional negative background material on Judge Duckman. These representatives were given access to one or more files containing transcripts of proceedings before Judge Duckman, which appear to have been ordered and preserved for some unspecified future use. Notably, some of these transcripts involving dismissed criminal charges were shown to the Governor's investigators without regard to the confidentiality rules that apply to sealed records (see, CPL 160.50). Having collected a list of complaints from trial assistants about petitioner's handling of their cases and his mistreatment of individual prosecutors, the investigators compiled a nine-page report that *159 was ultimately forwarded to the Judicial Conduct Commission.[1]
On February 28, just two weeks after the Komar killing, the Governor made a highly publicized demand that the Judge who released the killer be suspended and that formal disciplinary proceedings against him be commenced. This demand was accompanied by an ultimatum, announced at a gubernatorial press conference, that the Commission must either remove petitioner from office within 60 days or the Governor would initiate impeachment proceedings before the State Senate (see, NY Const, art VI, § 23 [b]).
On April 22nd, just a few days shy of the Governor's deadline, the Commission acted by announcing the filing of formal charges against petitioner. None of the charges were based on petitioner's bail decision in the Oliver case. Instead, the charges in question were cobbled together from a handful of incidents selectively drawn from tens of thousands of cases petitioner handled during his five-year tenure on the criminal Bench.
The majority's opinion details the evidence that led to the Commission's determination that petitioner should be removed, and there is no need to repeat the substance of that evidence here. Suffice it to say that, despite the fact that some 10,000 pages of transcripts were subpoenaed and scoured for petitioner's misdeeds, there were no clear "smoking guns"; there was only a list of petty offenses involving petitioner's "bullying" of prosecutors, his intemperate behavior and his improper dispositions of criminal charges in some 16 cases. The latter "misconduct" was evidently motivated by petitioner's view, expressed repeatedly on the record, that the particular prosecutions did not serve the interests of justice. Significantly, none of the 16 dismissed prosecutions in issue was deemed sufficiently important or meritorious to warrant an appeal, and none of the 19 incidents of intemperance were deemed sufficiently serious to warrant a disciplinary complaint.
What emerges from this sequence of events is a very disturbing picture. Given the timing of the investigation and the severity of the sanction imposed, the conclusion is inescapable that the Judicial Conduct Commission bowed to the Governor's political threats and allowed itself to be used to advance the *160 agenda of the Judge baiters who were feeding off the media frenzy.
No one  including petitioner  disputes that some of the specific behavior revealed by the evidence before the Commission constitutes impropriety and may even be worthy of some sanction. The argument here is not that petitioner's performance has been beyond reproach, but rather that he has been subjected to an extraordinary degree of microscopic scrutiny under circumstances that cannot help but serve as an object lesson to other Judges faced with the possibility of making an unpopular decision. While the existence of intemperate conduct by other judicial officers does not justify any of petitioner's excesses, it is also true that few Judges who, like petitioner, have handled tens of thousands of cases  and sometimes as many as 100 to 200 a day  could withstand the kind of intense spotlight that has been aimed at petitioner's record.
The implication of the present disciplinary proceeding is that Judges whose rulings displease the political powers that be may be subjected to a modern-day witch hunt in which their records are combed for indiscretions, their peccadillos strung together to make out a "substantial record" of misconduct and their judicial "sins" punished with the ultimate sanction of removal from office. Indeed, in this case, the inference that petitioner has been removed at least in part because of his interest in protecting individual defendants' rights is reinforced by the Commission's emphasis on his purportedly antiprosecution bias and his statements criticizing the District Attorneys' policies. It is clearly contrary to the goal of judicial independence to suggest that a Judge may be singled out for discipline because of his or her expressed views on questions affecting the criminal justice system.[2]
Our system of laws and the public's confidence in the judiciary rest in large measure on the notion that our Judges are *161 free to rule on the issues before them without fear of retaliatory removal. Without that freedom, there is no assurance that the choices Judges make in situations often involving unpopular alternatives have the necessary level of integrity. There are few among us who have the courage and fortitude to take judicial stands at the risk of public humiliation and loss of office. It is for that reason that our State Constitution mandates lengthy terms of office for Judges and permits removal of Judges only after impeachment by the Legislature or for grave cause after a fair adjudicative process administered by the State Commission on Judicial Conduct (NY Const, art VI, §§ 22, 23; see, Matter of Cunningham, 57 N.Y.2d 270, 275; Matter of Steinberg, 51 N.Y.2d 74, 81).
The perception arising from this case that the Commission is itself susceptible to political influences cannot help but undermine the confidence of the State's Judges in these constitutional protections and chill the free exercise of their judicial discretion. A precedent has now been set in which politicians and local prosecutors have demanded the removal of a widely respected sitting Judge for what they perceived as "criminal coddling" and have succeeded in that demand. Now that the Commission has demonstrated its willingness to be hospitable to such machinations, it seems likely, indeed inevitable, that Judges will be intimidated and will frequently be tempted to err on the side of the prosecution in debatable situations rather than risking Judge Duckman's fate. Nothing could be more inimical to the health of our State's system for administering criminal justice.
The record here unquestionably reveals that Judge Duckman was occasionally guilty of intemperate conduct and that he knowingly misused his authority to terminate 16 prosecutions in order to achieve what he believed to be the ends of justice. Accordingly, since these matters were brought to the attention of the disciplinary authorities, some form of sanction should now be imposed. It seems to me, however, that Judge Duckman's record of service as a whole does not indicate any unfitness for judicial office. To the contrary, the hearing testimony and the flood of letters that were made available to the Commission indicates that overall he has been an intelligent, hard-working, knowledgeable and compassionate jurist. Furthermore, to the extent that he demonstrated intolerance or intemperance, he did not do so out of malevolent or venal *162 motives;[3] rather, his actions were clearly motivated by compassion (see, Matter of LaBelle, 79 N.Y.2d 350). Finally, Judge Duckman has apologized for his excesses and has indicated that they will not occur again. Thus, there is no need to invoke the extreme sanction of removal; the lesser sanction of censure will suffice. Since the use of the removal power here not only deprives the public of a conscientious and hard-working Judge but also signals an unhealthy tolerance on the part of this Court for the heavy-handed tactics of would-be "Judge bashers," I dissent from the Court's acceptance of the Commission's imposed sanction.
BELLACOSA, J. (dissenting).
I, too, respectfully disagree in this separate dissenting opinion with the Per Curiam determination to remove this Judge from his judicial office. From my personal examination of this entire record, the evidence of sustainable misconduct does not rise to the extreme level of egregiousness, demanded by this Court's precedents, for that ultimate sanction to be imposed. Moreover, the precedential implications of this removal decision are daunting and disturbing (a) insofar as the future scope and operations of the Commission are concerned, and (b) for the future discharge of adjudicative responsibilities, especially by trial level judicial officers who have to maintain actual and perceptual independence from all outside influences.
This Court has consistently and appropriately set the bar of removal very high: it is "an extreme sanction [that] should be imposed only in the event of truly egregious circumstances" (Matter of Cunningham, 57 N.Y.2d 270, 275; compare, Matter of Roberts, 91 N.Y.2d 93, with Matter of Skinner, 91 N.Y.2d 142, 144; see also, Matter of Kiley, 74 N.Y.2d 364, 369-370; Matter of Steinberg, 51 N.Y.2d 74, 83). Our precedents ordain that "removal should not be ordered for conduct that amounts simply to poor judgment, or even extremely poor judgment" (Matter of Cunningham, supra, 57 NY2d, at 275 [emphasis added]).
The heavily relied-on set of specifications in the instant case boils down to the overarching charge that Judge Duckman improperly handled 16 criminal proceedings: 13 dismissals for facial legal insufficiency, one dismissal in the interests of justice, and two adjournments in contemplation of dismissal. *163 The accusations are that the Judge knowingly and wrongly dismissed these cases, without notice or an opportunity for the prosecution to be heard, without allowing a chance to redraft charges, without requiring written motions, and in the case of ACDs, without the consent of the prosecutor.
These extrapolated rulings were statutorily unauthorized and irregular devices; they constitute improper means to reach debatably correct ends. While they should not be countenanced, they do not equal disciplinary misconduct at the egregious level for removal from office. They absolutely do not represent a pattern of conduct in any realistic context and appraisal of the full record of this Judge's career. Rather, they are qualitatively and quantitatively exceptional, measured by a fair and proportional analysis of the full gamut and docket of any Judge, serving, as this Judge did, in such high volume and high intensity assignments, locales and courts. Thus, these few, never-appealed and disciplinarily resurrected remnants of cases are not so out-of-line as to justify removal of this Judge from his judicial office.
While I agree generally that this Court should resist "any numerical yardstick for determining unfitness" (Per Curiam opn, at 153-154), our precedents provide some measuring guideposts of the over-all judgmental quality and quantity necessary to elevate misconduct to a level of gravity that is required to impose the final and lifetime sanction of removal (compare, Matter of LaBelle, 79 N.Y.2d 350 [rejecting removal where the Judge failed to set bail without legal justification in approximately 24 cases], with Matter of Sardino, 58 N.Y.2d 286, 289-290 [upholding removal where the Judge (1) "consistently failed (in 62 cases) to inform the accused of the right to counsel and failed to conduct even a minimal inquiry to determine whether they were entitled to assigned counsel," (2) "regularly abused his authority with respect to setting bail," and (3) "often assumed an adversarial role at arraignments by questioning defendants"]; compare also, Matter of Skinner, 91 N.Y.2d 142, supra [rejecting removal and imposing censure], with Matter of Roberts, 91 N.Y.2d 93, supra [accepting removal]).
The record evidence in the instant case comes nowhere near the "distortion of the judicial function" that is reflected in Matter of Sardino (supra). This is especially so when weighed and evaluated within the precedential and judgmental universe of the multitude of other cited cases. To be sure, each disciplinary case with its sanction assessment is unique and different. Yet, the instant case fits closest to Matter of LaBelle (supra), where *164 the majority of this Court rejected the removal recommendation and imposed a serious, public censure. I consider of very high concern and weight, therefore, that the breakthrough precedent established by this case will seriously and widely expand the reasonably balanced guidance that the governing principles have ordained  up to now that is. And let no one make any mistake as to the grave, plenary responsibility invested exclusively in this Court by the State Constitution: the Commission cannot remove a Judge; only this Court can, absent impeachment.
This case also presents an additionally disturbing and distinct precedential concern in this allocation of power  i.e., that the Commission could infer that it has a new obligation and intrusive authorization to poke into the adjudicative work of Judges, legitimatized by this Court's ultimate precedential acceptance of a determined sanction recommended by the Commission majority, insofar as it rests on these quintessentially decisional matters of dismissed cases (compare, Matter of Greenfield, 76 N.Y.2d 293).
In Greenfield, this Court rejected the Commission's sanction, even of censure, where the record disclosed "serious administrative failings in petitioner's handling of the cases in issue, but no persistent or deliberate neglect of his judicial duties rising to the level of misconduct" (id., at 295). Although a Judge's failure to promptly dispose of pending matters is generally subject to administrative correction, the Commission pushed the envelope to urge "that at some point a Judge's failure to dispose of pending matters must be viewed as misconduct within its jurisdiction" (id., at 297). This Court emphatically rejected the Commission's misguided incursion, concluding that it "would overlap the jurisdiction clearly granted to those administering the courts" and "would permit the Commission to intervene in the administrative process whenever it believes that a Judge has failed to dispose of pending matters within unspecified time limits in an unspecified number of cases and on a case-by-case basis" (id., at 297). The instant case represents a far deeper incursion, insofar as the 16 now-disciplinarily challenged rulings are concerned, because the overlap and intervention drive into the very heart of the adjudicative administration and delivery of justice by a Trial Judge.
Furthermore, I am unable to accept that removal here may be justified under an exacerbation theory, related to a series of "instances of petitioner's inappropriate behavior in his dealings *165 with persons appearing before him, demonstrating impatience and intolerance, even at times ordering prosecutors who disagreed with him out of the courtroom" (Per Curiam opn, at 150-151). These unfit-to-serve characterizations are associated with and derived from a collection of misdeeds mixed with indecorous and indiscrete comments, admonitions, sarcasm and wisecracks. The utterances made in the rough-and-tumble world of the New York City arraignment and criminal courts are sharply contested, acontextual, selective and subjective. They also do not satisfy, on proportional record analysis, the substantive gravity needed for removal from judicial office (compare, Matter of Agresta, 64 N.Y.2d 327 [upholding censure]).
My reading of this record supports a contrary, or at least reasonably competing, point of view that the substance and credibility concerning many of the specifications of misconduct range from questionable-to-weak, and are subject to significant conflicting evidence favorable to the Judge's conduct and overall performance of his judicial duties. The record fairly and fully appraised, provides reasonable-to-strong mitigating and countervailing evidence, in substantive detail and in credibility, which contradicts the negative debasings of the Judge's character and the unfounded projection of his permanent unfitness for judicial office.
For example, various witnesses called by the Judge, and even by the Commission, portray the Judge as an unbiased and knowledgeable Judge. A good deal of criticism has been heaped on him for bias against some prosecutors whom he apparently found deficient in performance; indeed, none of them filed any contemporaneous complaints or appeals against him anywhere until he became publicly vilified. They did, however, keep negative material in personal files over the years that was retrieved and projectiled into his disciplinary proceeding.
Thus, I consider it fair to select some particular competing evidence that I find particularly relevant and cogent on the sanction weighing issue. Barry Kamins, a former prosecutor, Chair of the Grievance Committee for the Second and Eleventh Judicial Districts, past president of the Brooklyn Bar Association, and recent cochair of that Association's Judiciary Committee, testified that he had observed Judge Duckman in court several hundred times over the years and that the Judge "is more knowledgeable about criminal law, in my opinion, than any other judge in the Criminal Court in Kings County" (Transcript, vol XVI, at 3324). He also testified that he never heard the Judge "shout or yell," but at most "heard him speak *166 in a frustrating tone, which is not novel" (id., at 3331). He testified that the Judge "holds both sides accountable" and that there is no "double standard" (id., at 3333).
Former Judge and Acting Justice Alain Bourgeois, now a practicing attorney, also testified:
"From what I observed, he dealt with [issues] effectively, and although he was demanding of respective counsel, although he obviously held them to a high standard, I believed that he held them to an appropriate standard and an equivalent standard. I think the frustration that one feels sitting in the Criminal Court is difficult to contain; I didn't see it spill over in any way in Judge Duckman's handling of cases that I observed." (Transcript, vol XVI, at 3354.)
Juda Epstein, a former prosecutor who appeared before the Judge regularly, testified that the Judge "was absolutely down the line fair," that he did not treat the prosecution more harshly or differently from the way he treated the defense (Transcript, vol XVIII, at 3759, 3796). In fact, he testified that in one case, the defense attorney complained that the Judge was "too pro prosecutorial" (id., at 3796).
Gerald Allen, former Kings County prosecutor and former Deputy Bureau Chief of the Criminal Courts Bureau, called by the Commission, testified on cross-examination that the Judge was "definitely * * * the best trial judge in the building" (Transcript, vol VII, at 1388), and that he exhibited "almost exclusively good behavior" (id., at 1389).
These necessarily selective appraisals illustratively and strongly negate the mischaracterization of this Judge by the majority at the Commission on Judicial Conduct level (7 of 11 Commissioners). No matter how many favorable letters are assembled, however, they cannot make the case one way or the other on the appropriate sanction; no more, I respectfully submit, than the necessarily incomplete materials the Commission majority and this Court's Per Curiam opinion focus and rely on, and adopt. The whole record must be evaluated.
It is, nevertheless, quite significant to me that more than 100 attorneys wrote to the Commission in early 1996 to protest the publicized ultimatums for the removal of Judge Duckman  concerning a media-intensified ruling that proved not to be misconduct. This varied array of personal letters and direct appraisals are part of the whole record. They depict an individual *167 significantly different from and somewhat better than the "mean-spirited" and "bullying" Judge, sobriqueted by the Commission as some caricaturized martinet (see, Commission majority opn, at 7). The characterizations seem to me neither accurate, nor fair.
At least for some balance, it should be observed that the numerous evidentiary letters in the "Book of Letters" are neither from partisans, nor are they of merely character reference quality. They are from ordinary lawyers, court employees and others representing a wide cross section of people and professionals who worked in and around and observed Judge Duckman in the performance of his judicial duties over long and different periods of time. Surely, their real evidence is worthy of some consideration and greater weight than this material garnered from the Hearing Referee or the Commission itself  which apparently was naught.
These letters also provide and constitute empirical and directly relevant evidence presented as part of the defense case before the Commission on the sanction weighing issue. The credibility and lack-of-outcome interest of these many letter writers (thus enjoying some reasonable and creditable professional objectivity) are very illuminating for those who would look to the whole picture with its varying hues and textures. They are appropriate to weigh on the sanction mitigation aspects of this particular case, as this Court is exclusively obligated to do.
In sum, removing this Judge on this record represents a disproportionate redress, when examined in the dispassionate reflection of the less-than-egregious level of cobbled misconduct. This is especially so in the balance wheel of these overwhelmingly favorable, on-the-firing-line source appraisals of the Judge's adjudicative work and good character.
The genesis, breadth and nature of the exceedingly pervasive investigation of this Judge by the Commission staff are at least also contextually noteworthy. In my view, these features raise legitimate concerns and reflect an acutely unfair methodology with questionable motivation for the Commission's course of action. The diverse perceptions and evaluations, even among the Commission members, provide an eye opening window into understanding the skewed and distorted process that propelled itself ultimately into this divided Commission recommendation. Seven members voted to recommend the most severe sanction, and they were even divided as to some specifications; four *168 of the 11 Commissioners voted for censure only for differing reasons.
The dissenters at the Commission tendered an array of particulars for this Court to consider in mitigation of the sanction recommendation. They summarized their reasons for public censure as the sufficient level of redress, for example, as follows: (1) none of the acts committed resulted in a deprivation of liberty; (2) none of the acts was motivated by self-interest; (3) all of the improper dismissals involved misdemeanors; (4) on no occasion did prosecutors find Judge Duckman's knowingly erroneous dismissals of cases serious enough to warrant complaints to his judicial administrative superiors or even appeals by them as "aggrieved" litigant parties (though they instead chose to stockpile grievances in personal files for future retrieval to be used in collaboration with a drumbeat to remove a Judge for an unpopular decision); and (5) the instances of misconduct are few compared to the tens of thousands of cases Judge Duckman handled in his five-year career.
My judgment coincides with that of the dissenting Commissioners: the ultimate sanction here is disproportionate to the nature, number and gravity of the proven and acknowledged judicial misdeeds, misspeaks and mishaps. Under the applicable preponderance of the evidence standard, the case for the removal penalty falls short of the extreme egregiousness necessary. Since this Court is the only and exclusive guardian of a neutral and independent adjudication of these matters, it should reject the recommended sanction. Up to now I have concentrated essentially on the individual justice aspects of this Court's responsibility to accord to Judge Duckman all his rights of fair procedure and full review since we are his only court of review.
Now I turn to the twin tower of this Court's role  precedential responsibility. Removal here will have an inescapably adverse impact in that quintessential universe, as it affects the vital and vibrant independence of the judicial function and branch of government. The conduct of Judges and the culture of the operation and decision-making in trial courts will be necessarily and materially altered and affected by today's decision. Many of the effects will be hidden from view, buried in the hearts and psyches of Judges as they think, work and worry their way through a myriad of dockets and rulings, peering or at least seeming to peer over their shoulders at severely scrutinizing critics, disappointed lawyers, disgruntled litigants and the second-guessing Commission itself. Other consequences *169 include emboldening critics towards even more deconstructive attacks on Judges and their rulings at every turn, twitch and utterance. These combined visible and invisible consequences cannot help but threaten the independence and damage the integrity of the jewel of this State's judicial process  actually and perceptually. Fortunately, the judiciary and judicial process are strong and will survive, and so I agree with the Per Curiam opinion's observation that this case and circumstance do not create a state of peril. Yet, this does not bode well for the deliberative administration of justice.
Lastly, to the extent made relevant on the sanction determination, this Judge acknowledged on the record the inappropriateness of many of his actions (compare, Transcript, at 33, 53, 59, 66-68, 80, 81, 86, 97-98, with Per Curiam opn, at 155-156). In fact, in my view, the over-all tenor of the Judge's testimony and positions before the Hearing Officer, the Commission and this Court, was apologetic and contrite.
Moreover, this Court's guiding precepts do not demand that Judges who are fighting for their professional lives and reputations must throw in the towel as part of their "defense" (compare, Matter of Kiley, 74 N.Y.2d 364, 371, supra [removal rejected and censure imposed] [adding this Court's wise caution against using "lack of candor" (something I would deem worse than asserted "lack of contrition") as an aggravating circumstance to pump up a more serious sanction]). Thus, Judges should not have to "kneel penitently in the snows of Canossa" before the Commission; Judge Duckman is not Emperor Henry IV and the Commission is not Pope Gregory VII.
It should suffice that accused Judges should tell the truth, be candid and acknowledge wrongdoing that they are truly guilty of and to the extent necessary and consistent with maintaining a defense against wrongful criticisms and charges. Indeed, even an appropriate measure of remorse and resolve to conform to acceptable judicial behavior and norms are prudent and useful. On the other hand, Judges surely are not obligated to plead guilty, no matter what is thrown at them, nor are they expected to rely merely on the "mercy" of the Commission.
I vote for censure only, because I am unconvinced and unable to pronounce that this Judge is incorrigibly and irredeemably unfit to serve as a Judge ever again.
Determined sanction accepted, without costs, and Lorin M. Duckman is removed from his office of Judge of the Criminal Court of the City of New York, Kings County.
NOTES
[1] While petitioner attacks the Referee's Report as insufficient because it does not make explicit credibility findings, we note that the facts supporting the determination were largely established by documentary evidence, such as court transcripts of proceedings (which required no credibility determination) and petitioner's own testimony.
[2] Defendant had slurred speech, red eyes and a blood alcohol content of .08%. Petitioner admitted before the Referee that he knew that a .07% blood alcohol content constitutes prima facie evidence of driving while impaired (see, Vehicle and Traffic Law § 1195), but maintained that "it's not illegal to drink and drive." Explaining further, petitioner testified that there needs to be a "reasonable relationship between the drinking and the driving to show that the alcohol * * * somehow affected the individual's ability to operate the motor vehicle. * * * Absent some proof that the drinking affected the driving you can't get a conviction." Petitioner therefore dismissed the case.
[3] The former Chief of the Bronx Criminal Courts Bureau, Chief Assistant District Attorney in the Bronx, First Deputy Bureau Chief of the Criminal Courts Bureau in the Bronx and Bureau Chief of the Criminal Court in Brooklyn all testified that, based on complaints by others and, in some cases, direct observation, they repeatedly spoke with petitioner about the need to moderate his courtroom behavior. Petitioner acknowledges conversations with them, and admits to knowing that prosecutors from time to time ordered transcripts after his outbursts. Petitioner denies, however, having prior notice of the alleged wrongdoing. If in fact none of these indicators was sufficiently pointed to reach petitioner, that would underscore the problem that typified his misconduct.
[4] While these comments may not be indicative of a racist or sexist bias harbored by petitioner, they are highly inappropriate and completely antithetical to the role of a Judge. Indeed, even isolated instances of such inappropriate behavior cast doubt on a Judge's ability to be impartial and fair-minded.
[5] Samuels provides another example of petitioner's contradictory positions when testifying about his misconduct during the proceedings leading up to this appeal. When questioned about Samuels during the Commission's initial investigation, petitioner defended his actions in dismissing the case and was reluctant to admit that his intemperate treatment of prosecutors in that matter was inappropriate. During the hearing before the Referee, petitioner testified that his conduct was "a terrible example of [his] judicial demeanor and behavior" and that he was "embarrassed that [he] was the judge that sat on [the] case." Petitioner also testified that he "dismissed the charges for the wrong reason" and "didn't handle [the case] properly." In his Post-Hearing Memorandum, which was submitted to the Referee, petitioner stated that he had "properly dismissed the complaint" and had acted "within the proper ambit of his powers and duties." In his brief to this Court, petitioner referred to Samuels as "an example of a dismissal, with its attendant conduct, which [petitioner] agrees was terribly mishandled by him."
[6] Plainly the objective here is not to require contrition, bended knee or forfeiture of spine in return for the privilege of continued service as a member of the judiciary (see, Bellacosa, J., dissenting opn, at 169), but rather to attempt to assess petitioner's fitness based on his prior conduct.
[7] This matter does not involve "second-guessing" the adjudicative work of Judges, nor does it open a new avenue for Commission intrusion into that work (see, Bellacosa, J., dissenting opn, at 164, 168). Matter of Greenfield (76 N.Y.2d 293) involved a different issue  the time limits within which Judges should dispose of pending matters, an issue properly left in the first instance for the Judges themselves and secondarily for court administrators. Here the issue is not whether petitioner's decisions were right or wrong on the merits, but rather repeated, knowing disregard of the law to reach a result and courtroom conduct proscribed by the rules governing judicial behavior.
[1] The Commission subsequently obtained a judicial order directing these records be unsealed so that they could be used in evidence at the judicial conduct proceeding against Judge Duckman.
[2] While actual bias or even the appearance of bias is unacceptable in a Judge (see, Matter of Sardino v State Commn. on Judicial Conduct, 58 N.Y.2d 286, 290-291; Matter of Spector v State Commn. on Judicial Conduct, 47 N.Y.2d 462, 466), it is commonplace for Judges to express their own viewpoints during the course of the proceedings before them. For example, sentencing minutes often contain statements by Judges about the evils of crime and the impact that criminal conduct has on society. Similarly, in pretrial proceedings, Judges frequently interject their own concerns about such policy questions as "overcharging" and prosecutorial delays in processing cases. Although it would clearly be improper for a Judge to bend or stretch the law to advance his or her views on such subjects, it would unrealistic  and probably even undesirable  to require total neutrality in judicial decision-making.
[3] Although Judge Duckman was charged with having made offensive racist and sexist remarks, the majority has wisely eschewed reliance on that aspect of the charges, since it is apparent from the record that Judge Duckman is not a person who harbors such biases.