[851 NE2d 1175, 818 NYS2d 824]

In the Matter of LAURA D. BLACKBURNE, a Justice of the Supreme Court, Queens County, Petitioner. STATE COMMISSION ON JUDICIAL CONDUCT, Respondent.

Argued May 2, 2006; decided June 13, 2006

## POINTS OF COUNSEL

*Godosky & Gentile, P.C.,* New York City (*David M. Godosky* and *Richard Godosky* of counsel), for petitioner. I. This Court exercises plenary and de novo review of the Commission on Judicial Conduct's determination. (*Matter of Quinn v State Commn. on Jud. Conduct,* 54 NY2d 386.) II. The Commission on Judicial Conduct erred in determining that petitioner violated section 100.2 (C) of the Rules of Judicial Conduct (22 NYCRR). (*Matter of Levine,* 74 NY2d 294; *Matter of Kiley,* 74 NY2d 364; *Matter of Assini,* 94 NY2d 26; *Matter of Sims [State Commn. on Jud. Conduct],* 61 NY2d 349; *Matter of Gibbons,* 98 NY2d 448.) III. The Court of Appeals has never removed a judge for a single act of misconduct where such conduct was not based upon a breach of trust, corruption or moral turpitude or where there was no venal or racial motive. (*Matter of Sims [State Commn. on Jud. Conduct],* 61 NY2d 349; *Matter of Esworthy,* 77 NY2d 280; *Matter of Watson,* 100 NY2d 290; *Matter of Scacchetti v State Commn. on Jud. Conduct,* 56 NY2d 980; *Matter of Levine,* 74 NY2d 294; *Matter of Cerbone,* 61 NY2d 93; *Matter of Reedy,* 64 NY2d 299; *Matter of Heburn,* 84 NY2d 168; *Matter of Benjamin,* 77 NY2d 296; *Matter of Gibbons,* 98 NY2d 448.) IV. Removal of petitioner would be inconsistent with prior determinations of the Commission on Judicial Conduct and decisions of this Court. (*Matter of Kiley,* 74 NY2d 364; *Matter of Edwards,* 67 NY2d 153.)

*Robert H. Tembeckjian,* New York City, and *Alan W. Friedberg* for respondent. Petitioner's misconduct was egregious and warrants her removal from judicial office. (*Matter of Gibbons,* 98 NY2d 448; *Matter of Perry,* 53 AD2d 882; *Matter of Scacchetti v State Commn. on Jud. Conduct,* 56 NY2d 980; *Matter of Cerbone,* 61 NY2d 93; *Matter of Reedy,* 64 NY2d 299; *Matter of Levine,* 74 NY2d 294; *Matter of Benjamin,* 77 NY2d 296; *Matter of Heburn,* 84 NY2d 168; *Matter of Cohen [State Commn. on Jud. Conduct],* 74 NY2d 272; *Matter of Sims [State Commn. on Jud. Conduct],* 61 NY2d 349.)

*Mayer, Brown, Rowe & Maw LLP,* Chicago, Illinois (*Jeffrey W. Sarles* of counsel, admitted pro hac vice), for National Associa-

tion for the Advancement of Colored People, amicus curiae. I. The removal sanction imposed by the Commission on Judicial Conduct is unprecedented and does not fit the offense. (*Matter of Levine,* 74 NY2d 294; *Matter of Reedy,* 64 NY2d 299; *Matter of Kiley,* 74 NY2d 364; *Matter of LaBelle,* 79 NY2d 350; *Matter of Skinner,* 91 NY2d 142.) II. The Commission on Judicial Conduct's removal order appears to reflect a capitulation to public pressure and thereby threatens judicial independence. III. The unduly harsh sanction imposed by the Commission on Judicial Conduct is of particular concern to the civil rights community. (*Batson v Kentucky,* 476 US 79.)

*Joseph F. DeFelice,* Kew Gardens, and *Cheree A. Buggs* for Queens County Bar Association and others, amici curiae. I. The conduct of Justice Blackburne, a jurist with a previously unblemished record, warrants censure but not removal. (*Matter of Gibbons,* 98 NY2d 448; *Matter of Lonschein,* 50 NY2d 569; *Matter of Cunningham,* 57 NY2d 270; *Matter of Esworthy,* 77 NY2d 280; *Matter of Cohen [State Commn. on Jud. Conduct],* 74 NY2d 272; *Matter of Kiley,* 74 NY2d 364; *Matter of Bauer,* 3 NY3d 158; *Matter of Reeves,* 63 NY2d 105; *People v Miller,* 54 NY2d 616; *People v Gehy,* 238 AD2d 354.) II. Sanction of removal would deprive Queens County of a competent and experienced judge.

*Hinman Straub P.C.,* Albany (*David W. Novak* of counsel), for Association of Justices of the Supreme Court of the State of New York, amicus curiae. In the context of Justice Blackburne's entire legal career, her single error of judgment does not warrant removal from the bench. (*Matter of Sims [State Commn. on Jud. Conduct],* 61 NY2d 349; *Matter of Schilling,* 51 NY2d 397; *Matter of Watson,* 100 NY2d 290.)

### OPINION OF THE COURT

Per Curiam.

In June 2004, petitioner was presiding over the Queens Treatment Court, a specialized court in which nonviolent felons with a history of addiction can avoid incarceration by undergoing drug treatment. During the course of their treatment regimen, defendants must appear frequently before the court for supervision and monitoring. Among the cases on petitioner's June 10 calendar was that of defendant Derek Sterling, who was then receiving court-mandated treatment at a residential drug treatment program.

At approximately 10:00 A.M., Detective Leonard Devlin appeared at the Queens Treatment Court for the purpose of arresting defendant Sterling, whom the detective—as a result of a police investigation—believed had committed a serious robbery and assault. Upon his arrival, Devlin spoke to a court officer, Sergeant Richard Peterson, and explained that he wanted to question Sterling in connection with a robbery. As he later testified, Peterson understood from this that the detective intended to take the defendant into custody. Petitioner was not present in the courtroom during this exchange.

Because Sterling's case still needed to be called on the Treatment Court calendar, Detective Devlin went out into the hallway to await the conclusion of court proceedings. Meanwhile, Peterson went to see petitioner in her chambers, and told her that a detective had arrived to question Sterling in connection with a robbery. Petitioner appears to have mistakenly believed that such questioning would not involve taking the defendant into custody. Petitioner instructed the sergeant to notify Sterling's attorney to appear, and to advise the detective not to question the defendant in counsel's absence.[1]

Because Sterling's assigned counsel was unavailable, court personnel arranged for another attorney, Warren Silverman, to appear in Sterling's behalf. Silverman arrived while the court was in session, although Sterling's case had not yet been called. Upon speaking with the detective, Silverman learned that the defendant was to be arrested, not merely questioned.

Silverman reentered the courtroom and spoke with petitioner, advising her that the detective intended to arrest the defendant but declined to inform Silverman as to the nature of the charges. Responding that she was going to have Sterling taken out of the courtroom and out of the building through a side entrance, petitioner called Sergeant Peterson to the bench and directed him to take Sterling out through the back stairwell at the end of the calendar call. Inasmuch as the back area consisted of a secure hallway used by judges, jurors and court staff, and its stairwell led out to the judges' parking lot, Sergeant Peterson was "stunned." Concerned that he could get in trouble for either following or not following petitioner's instruction, he

---

1. Police may, of course, lawfully interrogate a suspect in counsel's absence despite the suspect's representation on a pending, unrelated matter (*see People v Bing*, 76 NY2d 331 [1990]). Although a court is not required to provide an attorney under these circumstances, neither is it forbidden from doing so if in its judgment the interests of justice will be better served.

discussed the matter with another court officer and with Assistant District Attorney Sharon Scott Brooking. After inquiring of Scott Brooking whether following petitioner's direction might constitute an obstruction of justice, the sergeant approached petitioner again, stated that he was "uneasy" about her directive, and asked her to speak to the prosecutor.

At the bench, Scott Brooking advised petitioner that having the defendant taken out through the back would be inappropriate and that, as a matter of policy, defendants should be arrested at court—not at their treatment programs—since they are encouraged to feel safe at the treatment programs. Petitioner responded that she was insulted that the detective, whose actual intention was to make an arrest, had entered the courtroom under the "ruse" of merely questioning Sterling. At no time did petitioner attempt to speak directly to the detective—who remained outside the courtroom—either to confront him with her belief that he had deliberately created a false impression, or to clarify that, in fact, his intent had always been to arrest the defendant, as the sergeant to whom he had spoken had understood. Rather, she presumed from what she took to be conflicting secondhand reports by Peterson and Silverman as to the detective's intentions that Devlin had actually provided two inconsistent accounts of his true purpose in looking for Sterling.

When the defendant's case was called, petitioner—in open court but outside the presence of the detective—stated:

> "Mr. Sterling, I don't know what else is going on. That's why I asked Mr. Silverman to be here to represent you. I understand that there is a detective on the premises who has some reason to believe that he ought to arrest you. I'm not going into that. That's not before me at this time. It is my hope that, whatever the issue is, it's not something that's going to [a]ffect your ability to continue in this program. I have directed that you be escorted out of the building by Sgt. Peterson because I—and I'm putting this on the record—specifically, I resent the fact that a detective came to this court under the ruse of wanting to ask questions when, in fact, he had it in his head that he wanted to arrest you. If there is a basis for him arresting you, he will have to present that in the form of a warrant. And it may occur at your program. I'm not saying it won't. But what I am saying to you is that if you go back to

your program and you do everything you are supposed to do at your program, if they appear with a legitimate warrant for your arrest then you follow that. I'm not trying to keep you from being arrested. I'm trying to keep you from being arrested today in my courtroom based on obvious misrepresentation on the part of the detective."

At the conclusion of the proceeding, Sergeant Peterson approached petitioner, again told her that he felt uneasy, and expressed his concern that her direction amounted to an obstruction of justice. Petitioner interrupted him and, while starting to stand up at the bench, stated that he had been given an instruction and that if he did not take Sterling out through the back exit, she would do so herself. Concluding that he, rather than petitioner, should escort the defendant so as not to compromise petitioner's safety or the safety of other judges, Peterson replied that he would do it. He then escorted Sterling out the side doorway, through the secure hallway and stairwell, and out the door to the parking lot.

When the detective learned that Sterling had left through a back exit, he hurried out the front door to try to locate him, but was unsuccessful. Sterling was arrested the following day at his drug treatment program and charged with robbery and assault. The charges against him were ultimately dismissed.

After receiving complaints from various parties, the Commission on Judicial Conduct began an investigation, at the conclusion of which it served petitioner with a formal written complaint containing one charge of judicial misconduct. After a hearing, Honorable Ernst H. Rosenberger, as Referee, determined that petitioner had failed to uphold the integrity and independence of the judiciary by failing to observe high standards of conduct, in violation of section 100.1 of the Rules of Judicial Conduct (22 NYCRR); failed to avoid impropriety and the appearance of impropriety in that she failed to act in a manner that promotes public confidence in the integrity and impartiality of the judiciary, in violation of section 100.2 (A) of the Rules of Judicial Conduct; and failed to perform the duties of judicial office impartially and diligently in that she failed to be faithful to the law and to maintain professional competence in it, in violation of section 100.3 (B) (1) of the Rules of Judicial Con-

duct.[2] The Referee further concluded that petitioner's testimony revealed "a person who, while conceding that she has done something wrong, and stating that she would now do things differently, nonetheless seeks to minimize her responsibility."

After hearing oral argument, the Commission determined that petitioner had violated each of the rules cited in the formal written complaint—including that unaddressed by the Referee—and unanimously sustained the charge of judicial misconduct. Eight Commissioners voted for removal, two for censure. Petitioner now requests review by this Court of the Commission's determination.

## Discussion

Conceding the impropriety of her conduct, petitioner devotes her argument to sanction, asserting that censure, not removal, is the appropriate remedy. Petitioner maintains that her actions, while improper, were motivated by a desire to protect the integrity of the Treatment Court, whose success rests on honesty and forthrightness. In this regard, petitioner testified that she believed at the time that had she permitted Detective Devlin to arrest the defendant, it would have appeared as if the court were complicit in the detective's "ruse," which would in turn have undermined the trust between the Treatment Court and its participants that is essential to the court's effectiveness. The Commission found, however, that petitioner acted out of anger and annoyance at the detective, who had, she believed, insulted her.

In any event, petitioner contends that a judge ought not to be removed from office for a single act of bad judgment, unless the misconduct involved venality, breach of trust, moral turpitude or personal gain. In pressing such a rule, petitioner catalogs each of our prior cases involving single acts of misconduct, noting that in one case there was venality; in another, corruption; and so forth. From this she concludes that only those fact patterns that have previously been the subject of disciplinary proceedings can justify removal. But we have never implied that removal is limited to those categories of cases that have formerly come before us. Judicial misconduct cases are, by their very

---

**2.** At the hearing before the Referee, the formal written complaint was amended to add an additional allegation—that petitioner lent the prestige of judicial office to advance the private interests of the judge or others, in violation of Rules of Judicial Conduct (22 NYCRR) § 100.2 (C). The Referee drew no conclusion of law with respect to this rule.

nature, sui generis. That until now no judge has thought to prevent the lawful arrest of a suspected felon cannot shield petitioner from the necessary consequence of her actions.

Although petitioner maintains that removal here would be unprecedented, in *Matter of Gibbons* (98 NY2d 448 [2002]) we removed a judge who, after signing a search warrant authorizing the search of a company's premises for environmental violations, notified the company's attorney of the impending search. There, as here, the judge "jeopardized the very legal system he was duty-bound to protect and administer" (98 NY2d at 450). Under those circumstances, we determined that removal was the proper sanction despite the Referee's finding that Judge Gibbons's single act of misconduct may have been motivated not out of any desire to impede the lawful execution of the search warrant, but rather simply out of anger at the company's alleged behavior.[3] In any event, we reject petitioner's argument that she should not be removed because removal would be unprecedented. Petitioner's *conduct* was unprecedented. We know of no instance in which a judge has facilitated the escape of an accused violent felon.

Nor can petitioner's misconduct be properly deemed to have consisted of only a single, unconsidered act. Petitioner acted out of anger and pique that she had, she mistakenly thought, been lied to. Even assuming that her initial mistake was reasonable—although Sergeant Peterson well understood that a detective who showed up in court looking to "question" a defendant in connection with a pending charge meant to take that defendant into custody, rather than question him in the courthouse—petitioner made no effort to clarify the situation. Rather than attempting to speak directly to the detective, she jumped immediately to an erroneous conclusion based on what she took to be two different accounts, from two different people, of what the detective had indicated.

Moreover, petitioner was given at least two chances to reconsider her position, having been specifically advised by both

---

**3.** Petitioner also relies on *Matter of Mills* (2005 Ann Report of NY Commn on Jud Conduct 185 [Dec. 6, 2004]), where the Commission merely censured a judge who unlawfully incarcerated an acquitted, unrepresented defendant in solitary confinement for four days, during which time the judge altered his contempt order to cover up the illegal basis for the punishment. However, we need not determine whether *Mills* was wrongly decided, since it is enough simply to note that the Commission's determination in *Mills* was never appealed to or reviewed by this Court.

the sergeant and the prosecutor that her direction was, to say the least, problematic. But instead of availing herself of these opportunities, petitioner worsened her misconduct by refusing to take seriously Sergeant Peterson's concern that he would be committing an obstruction of justice if he followed her directive. Nor was Peterson the only person endangered by petitioner's intransigence. Unconcerned that she might be putting her court officer at risk of legal jeopardy, petitioner's rash and reckless decision to release onto the street a suspected violent felon potentially posed a danger to the public. That the defendant returned peacefully to his drug treatment program, and in the end turned out not to have committed the crime of which he was then suspected, in no way redounds to petitioner's credit. Things might easily have turned out otherwise.

In impeding the legitimate operation of law enforcement by helping a wanted robbery suspect to avoid arrest, petitioner placed herself above the law she was sworn to administer, thereby bringing the judiciary into disrepute and undermining public confidence in the integrity and impartiality of her court. Although "removal is not normally to be imposed for poor judgment, even extremely poor judgment" (*Matter of Sims [State Commn. on Jud. Conduct]*, 61 NY2d 349, 356 [1984]),[4] petitioner's dangerous actions exceeded all measure of acceptable judicial conduct. By interposing herself between the defendant and the detective, petitioner abandoned her role as neutral arbiter, and instead became an adversary of the police. This is completely incompatible with the proper role of an impartial judge.[5]

Accordingly, the determined sanction should be accepted, without costs, and petitioner removed from the office of Justice of the Supreme Court, Queens County.

G.B. SMITH, J. (dissenting). I agree with the Commissioners who dissented from the decision to remove Justice Laura Blackburne from the bench and voted for censure. I thus dissent from the ruling of the majority.

Commissioner Coffey stated:

"The decision reached by the majority in this mat-

---

4. Notably, the judge in *Sims* was herself removed.

5. In light of our determination, we need not decide whether the Commission's conclusion that petitioner violated section 100.2 (C) of the Rules of Judicial Conduct was proper.

ter is unprecedented and I believe unwarranted. The mistake made by the respondent, while wrong and while sanctionable, was in all respects a classic case of an error of judgment, which we as a Commission historically have been very cautious in criticizing. For a single error of judgment, in the absence of a breach of trust, to result in removal from office is unduly harsh."

Commissioner Emery stated:

"The removal of Justice Laura Blackburne is both unprecedented and unfair. It is unprecedented because, until this case, neither this Commission nor the Court of Appeals has ever removed a judge based on a single event of misconduct, no matter how egregious, unless the misconduct was based upon breach of trust, venal conduct, moral turpitude or personal gain for the judge. It is unfair because this Commission is imposing career capital punishment upon an experienced, highly-respected and accomplished jurist, with an unblemished disciplinary history, who, indisputably, is unlikely to engage in this type of misconduct again."

On June 10, 2004, Justice Blackburne was informed that a police officer was present who wished to speak with a defendant who had been referred to a drug treatment program. She was subsequently informed that the officer was there to arrest the defendant. She was not informed what the arrest was for. She directed a court officer to escort the defendant from the courthouse to avoid being arrested in the court. She stated on the record that she was not trying to prevent the arrest but was acting because she felt that she had been misled.

A public outcry arose over the action, including statements from Governor Pataki and Mayor Bloomberg.*

On the day following the incident, the Patrolmen's Benevolent Association filed a complaint with the Commission on Judicial Conduct. Eventually, a hearing was held before a Referee, former Appellate Division Justice Ernst Rosenberger. He concluded that the petitioner had violated several sections of the Rules of Judicial Conduct. The Commission then voted, 8 to 2, to remove Justice Blackburne from the bench.

---

* The defendant was subsequently arrested for robbery. The charge was dismissed, but the record does not indicate why.

On December 1, 2004, during the direct examination of Justice Blackburne, she responded this way to the incident of June 10, 2004:

> "Q. Well, let me ask you this: As you sit here today and reflecting back on that day and what occurred, how do you feel about it today if that had occurred again? If it were to occur today in the same courtroom, what would you do?
>
> "A. I would have had a conference with the district attorney different from the conference that I had. I would have slowed it down and had even the officer come in and put something on the record. I would have asked my clerk to speak to the officer to find out what this was about for two reasons: One, first and foremost, if it was a felony arrest—and, at that point, I never knew what the arrest was for—but if it was for a felony, then, that would have had implications for Mr. Sterling's continued participation in the program. So that there were a number of things that I should have done at that time that I did not do.
>
> "Q. On that day, on June 10th, did you feel remorseful about what had happened?
>
> "A. Remorseful? . . .
>
> "Q. How did you feel that day, later that evening, reflecting on what occurred?
>
> "A. I felt remorseful. I felt ashamed, and I was angry at myself for having acting [sic] precipitously.
>
> "Q. Let me ask you this: From that day—After that occurs, from that day on till the present day, have you ever said to anyone you did the right thing?
>
> "A. Oh, certainly not.
>
> "Q. You felt it was the wrong thing. Correct?
>
> "A. Yes."

The Referee, a respected former Justice of the Appellate Division, found that Justice Blackburne had violated several provisions of the Rules of Judicial Conduct. The violations were of the following sections:

"Section 100.1 A judge shall uphold the integrity and independence of the judiciary

"An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved. The provisions of this Part are to be construed and applied to further that objective."

"Section 100.2 A judge shall avoid impropriety and the appearance of impropriety in all of the judge's activities

"(A) A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

"Section 100.3 A judge shall perform the duties of judicial office impartially and diligently . . .

"(B) Adjudicative responsibilities

"(1) A judge shall be faithful to the law and maintain professional competence in it. A judge shall not be swayed by partisan interests, public clamor or fear of criticism."

The Commission also determined that Justice Blackburne had violated these sections.

The action by Justice Blackburne was wrong and sanctionable. There is no dispute, however, that Justice Blackburne did not act for personal gain or for venal reasons.

Over the years, this Court and the Commission have removed a number of persons from the bench. Not until this case, however, has a judge ever been removed for one act of bad judgment. In this case, the Commission relies most strongly on *Matter of Gibbons* (98 NY2d 448, 450 [2002]). There, a town justice had issued a search warrant authorizing a search of a location for environmental violations. The justice had been previously involved with the company that was the target of the search. Nevertheless, he called the attorney for that company and during the conversation, revealed that a search warrant had been issued. The Commission recommended removal and this Court agreed.

In its opinion the Commission did not discuss the majority of the cases discussed in the opinion of the dissenting Commissioners or attempt to reconcile the differences in sanctions.

In *Matter of Skinner* (91 NY2d 142, 144 [1997]), a town justice of the Columbia Town Court in Herkimer County arranged for the arraignment of a friend who had been accused of sexual abuse at a time when no prosecutor was available. The justice then dismissed the case. In addition, the justice directed that an 18 year old who had passed a bad check return in two weeks with the amount of the check and fines totaling $335 as restitution. When the defendant returned but was $50 short, the justice jailed him, without advising him that he had a right to an attorney, until defendant's mother put up the money. While the Commission determined to remove the justice, this Court directed that a sanction of censure be substituted. It is simply not an adequate answer to say that the *Skinner* case occurred some time ago. The sanction here and the sanction in *Skinner* cannot be reconciled.

There is no good reason why the judges in the following cases were censured while Justice Blackburne is removed. In *Matter of Friess* (1982 Ann Report of NY Commn on Jud Conduct 109) the judge released a murder defendant into his custody and then took her home with him (no sexual purpose existed). In *Matter of Dusen* (2005 Ann Report of NY Commn on Jud Conduct 155) the judge issued an illegal court order and fabricated a conviction so that the defendant could be deported. In *Matter of Mills* (2005 Ann Report of NY Commn on Jud Conduct 185), a defendant who had been acquitted and was not represented by counsel was held in an isolation cell for four days and a contempt order was doctored to cover up the basis for the incarceration. The same judge jailed a defendant's father who allegedly used an expletive in a parking lot.

There is no sound reason to treat Justice Blackburne more harshly than Town Justice Skinner and Judges Friess, Dusen and Mills. But the disparity in sanction is even more glaring when cases in which this Court directed removal are compared to this case and when cases in which the Commission recommended removal or censure are compared to this case.

There is no sound reason to treat Justice Blackburne as harshly as a dozen other cases in which judges who were removed based on a single incident exhibited criminal or venal activity. Those cases, all cited by Commissioner Emery, include:

Court of Appeals:
*Matter of Scacchetti v State Commn. on Jud. Conduct* (56 NY2d 980, 981 [1982])—bribe solicitation; *Matter of Cerbone* (61 NY2d 93, 95 [1984])—derogatory reference to African Americans; *Matter of Reedy* (64 NY2d 299, 301 [1985])—attempted ticket fixing for son; *Matter of Levine* (74 NY2d 294, 295 [1989])—promise to a former political leader to adjourn a case and lying to the FBI; *Matter of Benjamin* (77 NY2d 296, 297 [1991])—sexual assault; *Matter of Heburn* (84 NY2d 168, 171 [1994])—false subscriptions on designating petitions.

Commission on Judicial Conduct:
*Matter of Bloodgood* (1982 Ann Report of NY Commn on Jud Conduct 69)—derogatory reference to Jews on court stationery; *Matter of Molnar* (1989 Ann Report of NY Commn on Jud Conduct 115)—solicitation of sexual favors; *Matter of Stiggins* (2001 Ann Report of NY Commn on Jud Conduct 123)—conviction for abuse of an incompetent person; *Matter of Westcott* (2004 Ann Report of NY Commn on Jud Conduct 160)—conviction for sexual relations with a mentally disabled person; *Matter of Brownell* (2005 Ann Report of NY Commn on Jud Conduct 129)—court check issued to pay a judgment after a case was mishandled; *Matter of Fiore* (2006 Ann Report of NY Commn on Jud Conduct —)—judge left for a job in Iraq.

Justice Blackburne has been an outstanding justice. Persons who testified on her behalf include Congressman Charles Rangel, former Mayor David Dinkins, former State Senator and candidate for Lieutenant Governor Basil Paterson, former Presiding Justice of the Appellate Division, Second Department, Milton Mollen, former Appellate Division Justices Seymour Boyers and John Carro and Appellate Division Justice Steven Fisher. Organizations submitting briefs on her behalf include the Association of Black Women Attorneys, the Association of Justices of the Supreme Court of the State of New York, the Latino Lawyers Association of Queens County, Inc., the National Association for the Advancement of Colored People, the Queens County Bar Association and the Queens Law Associates. None of these persons or organizations would support a judge they believed to be unqualified for continued service.

No good reason exists to remove from the bench an outstanding jurist who has made one error in judgment. While it is true that judges should set high standards, it is also true that judges are human and may err. An error in judgment by this judge, approximately two years from retirement, should not lead to removal.

I dissent.

Chief Judge KAYE and Judges CIPARICK, ROSENBLATT, GRAFFEO and READ concur in per curiam opinion; Judge G.B. SMITH dissents and votes to impose the sanction of censure in a separate opinion in which Judge R.S. SMITH concurs.

Determined sanction accepted, etc.