10 N.Y.3d 577 (2008)
890 N.E.2d 224
860 N.Y.S.2d 462
In the Matter of ROBERT M. RESTAINO, a Judge of the Niagara Falls City Court, Niagara County, Petitioner.
STATE COMMISSION ON JUDICIAL CONDUCT, Respondent.
Court of Appeals of the State of New York.
Argued April 22, 2008.
Decided June 5, 2008.
*578 Connors & Vilardo, LLP, Buffalo (Terrence M. Connors and Vincent E. Doyle III of counsel), for petitioner.
Edward Lindner, New York City, Robert H. Tembeckjian and John J. Postel for respondent.
Anthony D. Parone, Niagara Falls, and Morton H. Abramowitz *579 for Niagara Falls Boys' and Girls' Club, Inc., and others, amici curiae.
John M. Aversa, Niagara Falls, for Bar Association of Niagara County and others, amici curiae.
Walsh, Roberts & Grace, Buffalo (Gerald Grace, Jr., and Mark P. Della Posta of counsel), for New York State Association of City Court Judges, amicus curiae.
Niagara County Legal Aid Society, Niagara Falls (Mary Ann Oliver of counsel), Matthew T. Weber, W. Maxwell Coykendall and Emma Chapman, for Mary Ann Oliver and others, amici curiae.
*580 John J. Delmonte, Niagara Falls, for Daniel T. Lukasik, amicus curiae.
Sugarman Law Firm, LLP, Buffalo (Shannon M. Heneghan of counsel), for City of Niagara Falls Police Department and others, amici curiae.
Robert Viola, Niagara Falls, for Phi Alpha Delta Law Fraternity, International, amicus curiae.
Lipsitz Green Scime Cambria LLP, Buffalo (Herbert L. Greenman of counsel), for Family and Children's Service of Niagara, Inc., and others, amici curiae.
*581 David J. Farrugia, Public Defender, Lockport, Robert M. Pusateri and David Gerald Jay, Buffalo, for Niagara County Public Defender's Office and another, amici curiae.
Thomas M. O'Donnell, Acting Corporation Counsel, Niagara Falls (Christopher M. Mazur of counsel), for City of Niagara Falls, New York, amicus curiae.
Chief Judge KAYE and Judges CIPARICK, GRAFFEO, READ, SMITH and JONES concur in per curiam opinion; Judge PIGOTT taking no part.

OPINION OF THE COURT
Per Curiam.
At petitioner's request, we review a determination of the State Commission on Judicial Conduct which, with one member dissenting as to sanction, sustained a charge of misconduct and recommended that petitioner be removed from office (see NY Const, art VI, § 22; Judiciary Law § 44). In seeking review, petitioner concedes the facts as alleged, and challenges only the Commission's recommendation.
Based on the evidence adduced at the three-day hearing before a designated Referee, the Commission found as follows. Petitioner has been a Niagara Falls City Court Judge since 1996 and, as relevant, presided weekly over the Domestic Violence Part from 1999 until March 11, 2005, the date of the conduct in question. The domestic violence court[1] handles cases of defendants who, after arraignment on domestic violence charges, are screened and determined eligible for a court-supervised, 26-week program of counseling and education. Defendants in the program are required to avoid substance use, undergo counseling and periodic testing, and to report weekly as a way of monitoring their progress. Absent a violation of an imposed condition[2] for which they face potential sanctions (including revocation of release and imposition of bail), *582 defendants are released each week on their own recognizance. Following their appearance and unless permitted to leave, the practice in petitioner's court was to require defendants to remain in the courtroom until the completion of all scheduled proceedings that day.
On the morning of March 11, 2005, petitioner began his day by presiding over the first set of about 70 cases scheduled for their weekly hearings. The record shows that the courtroom was full and that, in addition to defendants awaiting their individual appearances, others were present, including defense attorneys and prosecutors, court personnel and security officers, as well as representatives from counseling programs. Additionally, the courtroom was open for those entering and leaving, including members of the public, relatives and other interested persons.
During the first hour of scheduled appearances, petitioner handled the cases of over 30 defendants in routine fashion. Of these, petitioner released 11 on their own recognizance and directed that they remain in court until all proceedings were concluded. At approximately 10:00 A.M., a cell phone or other similar device rang in the back of the courtroom. Addressing all defendants present, petitioner stated: "Now, whoever owns the instrument that is ringing, bring it to me now or everybody could take a week in jail and please don't tell me I'm the only one that heard that." After a fruitless inquiry of two defendants about the device, petitioner issued a second warning: "Everyone is going to jail; every single person is going to jail in this courtroom unless I get that instrument now. If anybody believes I'm kidding, ask some of the folks that have been here for a while. You are all going." Following these warnings, petitioner recessed for five minutes, directed court officers to locate the ringing device and instructed them that no one was permitted to leave the courtroom. As petitioner testified, during his recess, he did not reconsider withdrawing his threats. Upon returning, petitioner learned from a court officer that the device had not been discovered.
When the device rang at the back of the courtroom, a defendant was standing before petitioner at a podium prepared to issue his status report. Petitioner queried whether defendant knew who owned the device, to which defendant responded, "No. I was up here." Without equivocation and consideration of *583 the proper legal bases for doing so (see CPL 510.30)[3]and notwithstanding his knowledge that defendant, who was standing before him, did not own or otherwise possess the devicepetitioner revoked defendant's recognizance and set bail at $1,500.
Petitioner proceeded to summon each subsequent defendant remaining on the calendar34 in alland questioned each about their knowledge and/or ownership of the device. Dissatisfied with their responses, petitioner revoked or denied recognizance release and set bail. For two previously on release, petitioner increased bail. After summarily disposing of the remaining calendared cases, petitioner recalled 11 defendants whom he had previously released before the device rang and, after similarly questioning them about the device, revoked their recognizance release and imposed bail. In total, petitioner committed 46 defendants into custody. Of these, five had their release revoked; for three, it was their first appearance; the remaining had appeared on prior occasions. Of those committed, only one had an attorney present.
Based on petitioner's comments made while questioning certain defendants, it is clear that he was disturbed by the breach of courtroom decorum caused by the ringing device. The following are examples of petitioner's unsettling comments:
"You know, for some of you folks, this hurts me more than any of you imagine because someone in this courtroom has no consideration for you, no consideration for me and just doesn't care. . . .
"[W]hat I am really, really having a hard time with [is] that someone in this courtroom . . . is so self-absorbed, so concerned only for their own well-being, they kind of figure they're going to be able to establish the bail and it won't matter so screw all of the rest of you people. Some of you people may not be in the [same] economic situation [as] this selfish person is . . . [who] put[s] their interests [sic] above *584 everybody else's. They don't [sic] care what happens to anybody. . . .
"I hope [each of you are] watching every one of these people walk up here and deal with the reassessment of bail simply because they don't want to deal with the obvious . . . . It's that [phones are] not permitted in the courtroom. . . . [I]f you don't want to give me the instrument, now you're compounding something that is so simple and because you don't have a backbone and you don't want to be responsible for it."
Several defendants, when questioned about the instrument, tried to appeal to petitioner's better reason and, in some cases, pleaded with him for mercy. One defendant, for example, exhorted petitioner to rethink his approach to an otherwise legitimate courtroom concern that could be handled differently, stating: "I think the more people you send to jail, [the] less likely [the] culprit is to come forward," to which petitioner responded: "he'll go right to jail with everybody else." In other instances, one defendant pleaded that he had a doctor's appointment he would miss if jailed; others pleaded that they would lose their new jobs, that they did not have the resources to post bail. Others pleaded for simple fairness, exclaiming that "this ain't right," to which petitioner acknowledged: "You're right, it ain't right. Ain't right at all." Another had a scheduled appointment for counseling pursuant to an imposed condition, while another had his mother "in surgery [that] morning." Finally, another pleaded that he had a biweekly scheduled visit with his "little girl" that he would miss if jailed. These pleas fell on deaf ears.
At one point, petitioner commented that defendants' collective conduct resembled "a mob movie," referring to their perceived unwillingness to come forward with the offending device, stating:
"I got to tell you something, you're all pretty good when you come up to this microphone, and if you saw somebody got [sic] shot or killed, you would say, `I didn't see nothing [sic]. I heard shots.' And if a body dropped right in front of you, you would say . . . `I didn't see a thing.'"
Upon commitment to the custody of the Niagara Falls Police Department, the 46 defendants were transported to the city jail, booked, searched and their property confiscated and placed into *585 overcrowded holding cells. Following several hours of detention, 32 defendants posted bail; the remaining 14 could not, however, andshackled, with their wrists handcuffed to a lock box attached to a waist chainthey were subsequently transferred to the Niagara County Sheriff's custody and transported by bus to the county jail 30 minutes away, arriving at approximately 3:15.
Following the proceedings, petitioner left the bench and attended a scheduled tour of an Erie County juvenile detention facility. During the tour, petitioner received a page from his clerk who informed him that the press had inquired about his actions that morning. In response, petitioner instructed his clerk to have all paperwork necessary for defendants' release ready upon his return for him to execute release orders.[4] Petitioner returned to the courthouse at around 3:00 P.M. Approximately one hour later, he ordered the 14 defendants released, but they were not provided with transportation back to Niagara Falls.
By formal written complaint in June 2006, the Commission served petitioner with one charge alleging that he violated several of the Rules Governing Judicial Conduct, specifically 22 NYCRR 100.1, 100.2 (A), and 100.3 (B) (1), (3) and (6),[5] by arbitrarily revoking or denying the recognizance release status *586 of the 46 individuals in violation of CPL 510.30 and, consequently, depriving them of their liberty.
Following a three-day hearing, the Honorable Edgar C. NeMoyer, as Referee, determined that the Commission established its factual allegations.[6] In sum and substance, petitioner testified that he was experiencing deep-seated difficulties in his marriage, such as a lack of communication and intimacy. Petitioner explained that his way of dealing with them was to "bury" himself into his work and suppress the marital strains he was experiencing. With regard to ringing devices in the courtroom, petitioner testified that ordinarily court officers would go "about the business of locating it and either retrieving it or somehow addressing the issue right there" and he would continue with the court's business. Petitioner explained his skewed response of March 11 thusly:
"I was attempting to locate the instrument and [was] frustrated by the fact that that wasn't working and that I had indicated to all of the folks that were in the courtroom . . ., many of whom had been with me for some time and were aware of . . . the [parameters] of the program and I certainly know that when I said that, that's what was going on in my mind. I read [the transcript of the incident] today and I know that . . . [I] certainly [did] not exercis[e] good judgment. . . .
"I can only say to you that . . . [my reaction was] a function of . . . letting my own difficulties . . . bleed into the courtroom."
Petitioner added that he is cognizant of the gravity of his conduct, and that it would not recur: "I've learned that suppressing the kinds of things that occur in one's life isn't the healthiest way of addressing them."
*587 Among others, two psychiatrists petitioner consulted after the incident also testified. Dr. Joseph opined that petitioner was experiencing "a somewhat anxious crisis state of mind" due to a strained marriage, as described by petitioner. Dr. Joseph explained the events of March 11, 2005 as petitioner becoming "very frustrated with his marital situation and for reasons which I don't know, why on that particular day he erupted in an odd and peculiar manner," he tried to displace his frustrations about his wife's failure to communicate with him by having "people . . . listen to him" in the courtroom. Dr. Joseph characterized petitioner's eruption as "the last straw" of a suppressed frustration, but opined that petitioner is unlikely to repeat his conduct of March 11. Dr. Cooley, a psychologist, agreed with Dr. Joseph's conclusion, opining that the ringing cell phone was "the straw that broke the camel's back," that marital stressors "had been building up at home," and that petitioner placed a "great deal of time into his work" and neglected to address, head on, the problems he was facing.
The Referee concluded that petitioner violated the Rules Governing Judicial Conduct as charged. He acknowledged petitioner's "expressed remorse," which "appeared to be sincere." The Referee also considered the "persuasive testimony" of Drs. Cooley and Joseph, and concluded that petitioner "had been an efficient and competent judge outside of this incident and is well regarded in the community."
Following oral argument, the Commission recommended, by a vote of nine to one, that petitioner be removed from the bench. The Commission concluded that petitioner's actions "`exceeded all measure of acceptable judicial conduct,' bringing the judiciary into disrepute and irreparably damaging public confidence in his ability to serve as a judge" (quoting Matter of Blackburne [State Commn. on Jud. Conduct], 7 NY3d 213, 221 [2006]). The Commission opined that, in depriving 46 individuals of "their liberty out of pique and frustration," petitioner "abandoned his role as a reasonable, fair jurist." The Commission further noted that in the face of numerous opportunities petitioner failed to reconsider the "enormity" of his actions and that, "[i]n summarily committing the defendants into custody, [he] acted without any semblance of a lawful basis, disregarding the statutory criteria for bail or contempt of court." Finally, the Commission rejected petitioner's proffered mitigating circumstance, among others, that his conduct was the product of psychological stressors, concluding that his explanation was inexcusable and insufficient under the circumstances.
*588 Commissioner Felder dissented and voted to censure petitioner, concluding that, in light of petitioner's otherwise lengthy, distinguished career, his "two hours of inexplicable madness" should not result in removal. Commissioner Emery concurred with the majority and, in response to Commissioner Felder's dissent, opined that Blackburne (7 NY3d 213 [2006]) controlled.

Discussion
On review to this Court, petitioner limits his argument to the issue of sanction, arguing that removal is unwarranted in light of the proffered psychological evidence (which he claims the Commission ignored) and that his conduct was an aberration in an otherwise unblemished judicial career. He argues that, under the circumstances, such evidence, though not excusing his conduct, explains it and enables this Court to adequately determine his fitness to continue serving on the bench. Additionally, petitioner points to other mitigating factors, including remorse and contrition, an acknowledgment of the impropriety of his conduct and the assurance that it will not be repeated. In short, petitioner argues that in reviewing the Commission's recommendation, our goal is "`to attempt to assess [his] fitness based on his prior record'" (quoting Matter of Duckman, 92 NY2d 141, 156 n 6 [1998]). Notwithstanding petitioner's sincerity, we agree with and accept the Commission's recommendation.
Petitioner cannot dispute that "[p]unishing people by setting exorbitant bail . . . demonstrates a callousness both to the law and to the rights of criminal defendants" (Matter of Bauer, 3 NY3d 158, 163 [2004]; see also Matter of Sardino v State Commn. on Jud. Conduct, 58 NY2d 286, 289 [1983]). Admittedly, bail-setting and recognizance release determinations are generally "matters of discretion rather than law" (CPL 510.30 [2]). But when such tools of judicial administration are abused as punitive instruments to deprive a person of his or her libertya right of the most fundamental ordersuch conduct is inexcusable and does violence to the court's integrity and the inviolable public trust (see Matter of LaBelle, 79 NY2d 350 [1992]). This is especially true where, as here, defendants were guilty of no wrongdoing. We have no reason to disbelieve petitioner's assertion that he was simply attempting to uphold the integrity of his court. His method, howeveran overreaction to a "minuscule matter" (Matter of Roberts, 91 NY2d 93, 95 [1997])was no less egregious, no less skewed, and no less *589 damaging to the institution, generally, and to defendants' right to due process of law, specifically (see Sardino, 58 NY2d at 291).
Petitioner insists that he remains fit to serve on the bench, pointing to his prior record of exemplary service,[7] his remorse and contrition, and the evidence that his conduct was the product of psychological stressors.[8] In this arena, however, weighty competing interests abound, and we must take care to carefully balance them (see Matter of Hart [State Commn. on Jud. Conduct], 7 NY3d 1, 8-9 [2006]). Thus, we have long defined the purpose of a judicial disciplinary proceeding not in terms of punishment for its own sake, "but [for] the imposition of sanctions where necessary to safeguard the Bench from unfit incumbents" (Duckman, 92 NY2d at 152).
Indeed, the rules under which petitioner was charged reflect this concern (see 22 NYCRR 100.1 ["An independent and honorable judiciary is indispensable to justice"], 100.2 [A] [a judge must "respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary"]; see also 22 NYCRR 100.3 [B] [1], [3], [6]; Matter of Lonschein, 50 NY2d 569, 572 [1980] [judges' actions "must be measured against exacting standards of scrutiny to the end that public perception of the integrity of the judiciary will be preserved"]). As petitioner correctly notes, we have repeatedly stated that the ultimate sanction should be reserved for "truly egregious circumstances" that extend beyond the limits of "even extremely poor judgment" (Matter of Kiley, 74 NY2d 364, 369, 370 [1989]; see also Matter of Sims [State Commn. on Jud. Conduct], 61 NY2d 349, 356 [1984]). It *590 is also true, however, "that the `"truly egregious"' standard is measured with due regard" to the higher standard of conduct to which judges are held (Matter of Assini, 94 NY2d 26, 31 [1999] [citation omitted]), and in our view, petitioner's conduct qualifies as "truly egregious."
While we duly note petitioner's mitigating factors particularly his service recordwe have never defined fitness as resting solely on technical competence and have specifically rejected "any numerical yardstick for determining unfitness" (Duckman, 92 NY2d at 153-154). Of ultimate importance in that calculus must be the nature and gravity of the proven wrongdoing (see Matter of Aldrich v State Commn. on Jud. Conduct, 58 NY2d 279, 283 [1983]). Thus, we have previously stated that in rare cases "no amount of [mitigation] will override inexcusable conduct" (Bauer, 3 NY3d at 165) sufficient to restore the public's trust in the judge's ability to faithfully execute his or her duties (see Blackburne, 7 NY3d at 220, 221). "[A] cornerstone of our democracy" is the integrity of our judiciary (Duckman, 92 NY2d at 156), and judges must be mindful that their actions "reflect, whether designedly or not, upon the prestige of the judiciary" (Lonschein, 50 NY2d at 572).
Here, the public which petitioner serves has, we think, irretrievably lost "confidence in his ability to properly carry out his" constitutionally-mandated responsibilities in a fair and just manner (Aldrich, 58 NY2d at 283; see also Matter of McGee v State Commn. on Jud. Conduct, 59 NY2d 870, 871 [1983]; Matter of Kuehnel v State Commn. on Jud. Conduct, 49 NY2d 465, 469 [1980]). By indiscriminately committing into custody 46 defendants, petitioner deprived them of their liberty without due process, exhibited insensitivity, indifference and a callousness so reproachable that his continued presence on the bench cannot be tolerated. We cannot overstate that the public must be able to "continue to rely upon the impartiality of those who have been chosen to pass judgment on legal matters involving their lives, liberty and property" (Sardino, 58 NY2d 286, 290-291 [1983]; see also Matter of Backal, 87 NY2d 1, 6 [1995]; Matter of Esworthy, 77 NY2d 280, 282 [1991] [duty to conduct oneself in manner that "inspire(s) public confidence in the integrity, fair-mindedness and impartiality of the judiciary"]). And here, we have serious doubts that this breach in trust is reparable given petitioner's conduct (see 22 NYCRR 100.3 [B] [1], [3], [6]; see also Sardino, 58 NY2d at 291). As the Commission opined, it is ironic that petitioner displayed the very attributes *591 by which he accused and summarily punished each defendant. Significantly, petitioner had more than 46 chances to correct himself and failed to do so.
Accordingly, the determined sanction should be accepted, without costs, and Robert M. Restaino removed from office.
Determined sanction accepted, without costs, and Robert M. Restaino removed from the office of Judge of the Niagara Falls City Court.
NOTES
[1] Domestic violence courts are dedicated to enhancing victim safety and holding offenders accountable, facilitating victim access to necessary services, and ensuring intensive judicial monitoring, among other things.
[2] According to petitioner, the practice in his court was to sanction a defendant who violated such conditions as not appearing in court, testing positive for drugs or not attending designated counseling.
[3] Section 510.30 (2) (a) requires, in relevant part, that the following criteria be employed in determining an order of recognizance or bail: "the kind and degree of control or restriction that is necessary to secure [a defendant's] court attendance when required," as informed by defendant's character and reputation, employment and financial resources, family ties and length of residence in the community, prior criminal record and attendance record in prior proceedings.
[4] In this regard, petitioner testified, contrary to the Commission's finding, that he realized, and decided to correct, the error of his action prior to, and independent of, his clerk's informing him of the press' inquiry. Petitioner testified that as he was taking the tour, he began "thinking about what I've just been in, [and] I begin [sic] to believe that I've got to make a call to get to my clerk to correct what I did. I've got to undo this . . . at the end of the tour." Ultimately, however, the precise motivation for petitioner's corrective action is, in light of the gravity of his conduct, inconsequential.
[5] Section 100.1 states:

"An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved. The provisions of this Part are to be construed and applied to further that objective."
Section 100.2 (A) provides: "A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary."
Section 100.3 (B) (1) provides: "A judge shall be faithful to the law and maintain professional competence in it. A judge shall not be swayed by partisan interests, public clamor or fear of criticism."
Section 100.3 (B) (3) provides: "A judge shall be patient, dignified and courteous to litigants, jurors, witnesses, lawyers and others with whom the judge deals in an official capacity, and shall require similar conduct of lawyers, and of staff, court officials and others subject to the judge's direction and control."
Finally, section 100.3 (B) (6) provides:
"A judge shall accord to every person who has a legal interest in a proceeding, or that person's lawyer, the right to be heard according to law. A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties or their lawyers concerning a pending or impending proceeding."
[6] In his testimony, petitioner acknowledged that he perverted the bail system by using it as an instrument of punishment, rather than "for securing a defendant's attendance at court." As petitioner conceded, "I was thinking in terms of sanctions and not in terms of the CPL."
[7] Petitioner has, indeed, made notable contributions to the administration of justice and, as evidenced by the numerous amicus curiae submissions in support of his review, is well respected within the community.
[8] Petitioner argues that by failing to recognize the proffered evidence of psychological stressors, and by holding judges to a higher standard than the general public, the Commission "perpetuates the negative stigma feared by any judge who should seek treatment for stress or other psychological problems." Having concluded that the Commission did not ignore petitioner's proffered explanation, we disagree with petitioner's hypothesis, which implies that holding judges to a higher standard of conduct is mutually exclusive with and contrary to an open system that encourages all members of the bench to seek counseling as needed. Indeed, the State has been proactive in ensuring that members of the bench and bar have access to critical services in strict confidence. The New York State Lawyer Assistance Trust works closely with local bar associations to ensure that members of the bench and bar have ready access to early intervention and assistance to ensure that they do not reach a critical stage in their personal dilemmas.