# State of New York
# Court of Appeals

## OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 61
In the Matter of the Hon. Robert
J. Putorti, a Justice of the Whitehall Town
Court and the Whitehall Village Court,
Washington County.

Robert J. Putorti,
     Petitioner;
New York State Commission on
Judicial Conduct,
     Respondent.

Nathaniel V. Riley, for petitioner.
Robert H. Tembeckjian, for respondent.

Per Curiam:

Petitioner, a Justice of the Whitehall Town Court and Whitehall Village Court,

Washington County, seeks review of a determination of the State Commission on Judicial

Conduct that he committed certain acts of misconduct and should be removed from office

(*see* NY Const, art VI, § 22; Judiciary Law § 44). Upon our independent review of the record, we conclude that the charges are sustained by the evidence, and that the sanction of removal is appropriate.

Petitioner has been a Justice of the Whitehall Town Court since 2014. He took office as a Justice of the Whitehall Village Court in 2018, having served in that office in an acting capacity since 2014. One day in late 2015, while presiding over Whitehall Village Court, petitioner brandished a loaded firearm at a litigant who was waiting for his case to be called. In 2020, the Commission served petitioner with a formal written complaint containing a single charge arising from that incident (Charge I). In 2021, the Commission served petitioner with a second formal written complaint containing an additional charge, which alleged that he had engaged in improper fundraising (Charge II). In lieu of a hearing, petitioner entered into an agreed statement of facts (*see* Judiciary Law § 44 [5]).

## I.

### *Agreed-upon facts as to Charge I*

Petitioner has been licensed to carry a firearm since 2003 and had been advised at a 2013 judicial training course that he could legally carry a concealed firearm at the bench. Petitioner's practice was to keep the firearm attached to the underside of the bench using a magnet while he was presiding over his courtroom. The courtroom had no assigned security personnel, though the courtroom was adjacent to the Whitehall Village Police Department. There was an entrance to the police station several feet from the bench, and a police officer was occasionally present in the courtroom. Indeed, petitioner identified a

police officer who he claimed had been present at the time he brandished his firearm at the litigant.

The litigant, a six-foot, 165-pound Black man, had been in Whitehall Village Court earlier in the year on a felony charge based on allegations that he brandished a knife at his wife and another man while they sat in a parked car. The felony charge was dismissed on consent of the prosecution, and the litigant pleaded guilty to a misdemeanor charge in exchange for a one-year conditional discharge and fines and surcharges totaling $555. The litigant was later jailed for failing to pay the fine; however, his wife told petitioner that the litigant could not afford to pay the fine. In response, petitioner went to the courthouse on his lunch hour from his other employment, reduced the fine to community service, and released the litigant. It was at a later appearance that petitioner brandished the firearm. Although petitioner claims that he "subjectively feared for his safety," he admits that he had "no reasonable basis" to believe that the litigant "was about to use imminent deadly force," and that he was "not justified" in brandishing the firearm.

Petitioner repeatedly recounted his story of the incident to others, at least once in an apparently boastful manner. In fall 2015, he recounted the incident to his cousin, a Hofstra University journalism student, for an article that was eventually published in a Long Island news source. During the interview, he described his practice of carrying a firearm on the bench and said that he once brandished his firearm at " 'someone' who came running up to him at the bench and to whom he said, 'whoa, whoa, whoa, slow down.' " As petitioner stipulated, however, neither the police officer nor an assistant district attorney who

petitioner claimed had been present at the time would have corroborated this version of events if called to testify at a hearing.

In early 2016, petitioner showed the article to another judge, telling her about a time he drew his firearm on an " 'agitated' 'big Black man' " when the man approached the bench too quickly. From petitioner's "manner and tone," the judge had the "impression" that petitioner "was bragging about his actions and that he was expressing pride about being featured in the article." The judge also overheard petitioner tell other judges about the article and incident at a 2016 Washington County Magistrates Association meeting.

At another Association meeting in 2018, while seeking advice about courtroom security, petitioner told the judges in attendance, including his supervising judge, that he once pointed his firearm at a " 'large [B]lack man' " who had passed the stop line and came within "a couple" feet of the bench while a police officer was standing at the bench. Petitioner recounted that the litigant stated that he "just wanted to talk," and he added that the officer made a joke about how quickly petitioner had been able to draw the gun.

One of the judges in attendance expressed concern to petitioner's supervising judge, who then had a phone conversation with petitioner. Petitioner explained to his supervising judge that the incident occurred when he called the litigant's case, and the litigant "ran quickly to the bench, past a line where defendants are supposed to stand." Petitioner added that the officer, who was serving as " 'security,' " allowed the litigant to approach "within two feet" of the bench. Petitioner described the litigant to his supervising judge as "a 'large [B]lack man,' about 6'9" tall and 'built like a football player,' " saying nothing about the litigant's criminal charges. Petitioner told his supervising judge that he drew his firearm

and " 'pointed it at' " the litigant. He explained that, although a bullet was not in the chamber, it takes " 'a split second' " to load. Petitioner further told his supervising judge that the litigant said he " 'just wanted to talk' " to petitioner, who said that he would talk once the litigant moved back behind the line, at which point the litigant stepped back behind the line, and petitioner put his gun away. After this phone conversation, petitioner signed a counseling memorandum agreeing never to display a firearm in court unless confronted with deadly physical force. Indeed, he also claims that, after the phone conversation, he stopped carrying a firearm in the courtroom.

Petitioner stipulated that his conduct violated sections 100.1, 100.2 (A), 100.3 (B) (3), 100.3 (B) (4), and 100.4 (A) (1) and (2) of the Rules Governing Judicial Conduct (22 NYCRR). With respect to section 100.3 (B) (3), petitioner agreed that he "failed to perform judicial duties without bias or prejudice against or in favor of any person and without manifesting in words or conduct bias or prejudice based upon race." In addition, although he maintained that he mentioned the litigant's race "merely to describe him," he acknowledged that in doing so he "may have created the appearance of racial bias."

*Agreed-upon facts as to Charge II*

Petitioner engaged with eight Facebook posts promoting nonprofit fundraising events during the period October 2019 through November 2020—after he had become aware that the Commission was investigating the misconduct that resulted in Charge I. During that period, petitioner's page was viewable by the public, and he had over 1,300 "friends," many of whom knew he was a judge. These included the Washington County District Attorney, other attorneys, and police officers.

In October 2019, petitioner was "tagged" in a post promoting a spaghetti dinner to raise money for the purpose of covering medical expenses that petitioner had incurred in a motorcycle accident. Rather than delete the post from his page to avoid any appearance of impropriety, petitioner wrote, "I hope to see as many people as I can." Over 500 people attended, raising $9,400. Some of petitioner's "friends" saw the post, but none of them felt pressure to attend due to his status as a judge. One police investigator, who was also associated with petitioner through the Elks Lodge, attended the event and bought raffle tickets, but he did not remember if he saw the Facebook post.

Petitioner also shared and commented on Facebook posts promoting seven fundraising events to benefit the Elks Lodge, in which he held office. These fundraisers included two barbecues, each of which was attended by over 200 members of the general public. The barbecues raised nearly $3,500 in total. The other five events were restricted to Lodge members and raised under $1,000 in total.

Petitioner stipulated that his conduct violated sections 100.1, 100.2 (A), 100.2 (C), and 100.4 (C) (3) (b) (i) of the Rules.

*Commission's determination*

The Commission, with one Commissioner dissenting, determined that removal was appropriate for petitioner's "extreme breach of judicial decorum" in brandishing a loaded firearm at a litigant in court, for creating the appearance of racial bias by repeatedly mentioning the litigant's race in his retellings of the incident, for his apparent pride in and lack of remorse for his misconduct, and his lack of attention to his ethical responsibilities. Contrary to the dissent, the Commission found that there was evidence of racial bias,

including petitioner's own admission that he may have created the appearance of racial bias when he repeatedly referred to the litigant's race.

## II.

Contrary to petitioner's contention, the investigation was procedurally proper. The Commission may on its own motion initiate an investigation of a judge (*see* Judiciary Law § 44 [2]; 22 NYCRR 7000.2) and, if in the course of an investigation the Commission's staff becomes aware of unrelated acts that may constitute misconduct, the Commission may then authorize an investigation of that conduct in a separate complaint (*see* New York State Commission on Judicial Conduct Policy Manual § 2.6 [A], at 7 [May 2022]). There is no dispute that the investigation into the firearm incident was properly authorized in this manner. The Commission's staff appropriately searched petitioner's public social media account to investigate whether he had made any additional remarks about that incident, and there is no dispute that the investigation into the improper fundraising was properly authorized in the same manner thereafter.

## III.

Petitioner challenges the Commission's finding of racial bias. While we have the authority to review findings of fact as well as the determined sanction (*see* NY Const, art VI, § 22 [d]; *Matter of Marshall*, 8 NY3d 741, 743 [2007]), we note that the Commission was bound to make its determination upon the agreed statement of facts (*see* Judiciary Law § 44 [5]). The agreed-upon facts included an admission by petitioner that he failed to perform his judicial duties "without manifesting in words or conduct bias or prejudice based upon race, in violation of [s]ection 100.3 (B) (4) of the Rules." Moreover, judges

have a "continuing obligation to avoid even the appearance of impropriety" (*Matter of George [State Commn. on Jud. Conduct]*, 22 NY3d 323, 331 [2013]) and, here, petitioner acknowledged that his conduct "may have created the appearance of racial bias." We stress that the "appearance of such impropriety is no less to be condemned than is the impropriety itself" (*Matter of Spector v State Commn. on Jud. Conduct*, 47 NY2d 462, 466 [1979]; *see Matter of Duckman*, 92 NY2d 141, 152-153 [1998]).

Despite these conclusive admissions, petitioner now argues that he was *not* acting with racial bias and that his repeated reference to the litigant as a " 'big Black man' " was meant merely to describe him. But this is not a mere physical description of the litigant. By repeatedly referring to the litigant in the manner that he did, petitioner exploited a classic and common racist trope that Black men are inherently threatening or dangerous, exhibiting bias or, at least, implicit bias[*] (*see* Mikah K. Thompson, *Bias on Trial: Toward an Open Discussion of Racial Stereotypes in the Courtroom*, 2018 Mich St L Rev 1243, 1249-1250). For these reasons, we see no basis to set aside the finding of racial bias.

---

[*] New York's judicial system recognizes the pernicious effect that implicit bias often has on the fair and equal administration of justice (*see* CJI2d Model Instructions: Implied Bias, available at https://www.nycourts.gov/judges/cji/1-General/CJI2d.Implicit_Bias.pdf [last accessed Oct. 13, 2023]; Pamela M. Casey et al., *Addressing Racial Bias in the Courts*, 49 Court Review: The Journal of the American Judges Association 64, 64-70, available at https://ww2.nycourts.gov/sites/default/files/document/files/2018-11/ARTICLE_ADDRESSING%20IMPLICIT%20BIAS%20IN%20THE%20COURTS.pdf [last accessed Oct. 13, 2023]).

IV.

We also uphold the sanction of removal. Judges must observe higher standards of conduct than members of the general public, so that the integrity of the judiciary will be preserved (*see* 22 NYCRR 100.1; *Matter of Kuehnel v State Commn. on Jud. Conduct*, 49 NY2d 465, 469 [1980]). Judges must "act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary" (22 NYCRR 100.2 [A]). Judges must "be patient, dignified and courteous" to all persons with whom they deal in a judicial capacity (22 NYCRR 100.3 [B] [3]). Judges must perform their judicial duties "without bias or prejudice against or in favor of any person" and, in the performance thereof, must not "by words or conduct, manifest bias or prejudice" based upon race, color, or any other protected characteristic (22 NYCRR 100.3 [B] [4]). While the extreme sanction of removal is warranted only in the event of " 'truly egregious circumstances' that extend beyond the limits of 'even extremely poor judgment' " (*Matter of Restaino [State Commn. on Jud. Conduct]*, 10 NY3d 577, 589 [2008]), we measure this "truly egregious" standard "with due regard to the fact that Judges must be held to a higher standard of conduct than the public at large" (*Matter of Collazo [State Commn. on Jud. Conduct]*, 91 NY2d 251, 255 [1998]; *see Restaino*, 10 NY3d at 589-590).

What constitutes "truly egregious" circumstances is a fact-specific inquiry (*see Matter of Ayres [State Commn. on Jud. Conduct]*, 30 NY3d 59, 64 [2017]). We consider both the gravity of the wrongdoing and the "effect of petitioner's conduct upon public confidence in his character and judicial temperament" (*Matter of Going*, 97 NY2d 121, 127 [2001]). While removal is often reserved for a judge who engages in a pattern of

misconduct (*see Matter of Jung [State Commn. on Jud. Conduct]*, 11 NY3d 365, 374 [2008]), there are rare cases where the misconduct is so inexcusable that no amount of mitigation can be "sufficient to restore the public's trust" in the judge's ability to discharge the responsibilities of judicial office "in a fair and just manner" (*Restaino*, 10 NY3d at 590).

This is such a case. While presiding over his courtroom, petitioner brandished a loaded firearm at a litigant who presented no threat to anyone. Rather than show remorse, he described his conduct in a press interview and boasted about it to his colleagues, while repeatedly, and gratuitously, referring to the litigant's race. Also troubling is petitioner's denial in this Court of facts to which he previously stipulated. Petitioner's unfitness for office is further demonstrated by his improper use of social media to solicit donations. Although the improper fundraising would not by itself warrant removal, its timing and the circumstances under which it occurred—while petitioner was under investigation on Charge I—evince an unwillingness or inability to abide by the Rules of Judicial Conduct.

For these reasons, "the record amply supports the conclusion that petitioner's misconduct 'transcends poor judgment' and warrants removal" (*Going*, 97 NY2d at 127). Accordingly, the determined sanction should be accepted, without costs, and Honorable Robert J. Putorti removed from the offices of Justice of the Whitehall Town Court and Whitehall Village Court, Washington County.

Determined sanction accepted, without costs, and Honorable Robert J. Putorti removed from the offices of Justice of the Whitehall Town Court and Whitehall Village Court, Washington County. Opinion Per Curiam. Chief Judge Wilson and Judges Garcia, Cannataro, Troutman and Halligan concur. Judges Rivera and Singas took no part.

Decided October 19, 2023