Matter of State of NY ex rel. Fischetti v Brann (2018 NY Slip Op 06220)





Matter of State of NY ex rel. Fischetti v Brann


2018 NY Slip Op 06220


Decided on September 25, 2018


Appellate Division, First Department


Tom, J., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on September 25, 2018
SUPREME COURT, APPELLATE DIVISION
First Judicial Department

Rolando T. Acosta,P.J.
Sallie Manzanet-Daniels
Peter Tom
Angela M. Mazzarelli
Peter H. Moulton, JJ.


30222/17 30207/17 3160/17 101651/17 101532/17 

[*1]In re The People of The State of New York ex rel. Ronald P. Fischetti, etc., Petitioner-Appellant,
v
Cynthia Brann, etc., Respondent-Respondent, Anyone Having Custody of Petitioner, Respondent.
In re The People of The State of New York ex rel. Ronald P. Fischetti, etc., Petitioner-Appellant,
v
Cynthia Brann, etc., Respondent-Respondent, Anyone Having Custody of Petitioner, Respondent.



Petitioner appeals from the judgment of the Supreme Court, New York County (Roger S. Hayes, J.), entered on or about November 3, 2017, denying a writ of habeas corpus and dismissing the petition, and from the judgment of the same court (A. Kirke Bartley, Jr., J.), entered November [*2]27, 2017, denying a subsequent application for a writ of habeas corpus and dismissing the petition.




Law Offices of Eric Franz, PLLC, New York (Eric Franz of counsel), for appellant.
Cyrus R. Vance, Jr., District Attorney, New York (Joel J. Seidemann and Armand Durastanti of counsel), for respondent.



TOM, J.


This appeal, concerning the denial of petitioner's two petitions for writs of habeas corpus, is the latest chapter in what began as a bitter custody battle that culminated in Family Court finding that petitioner Pamela Buchbinder, the defendant in this criminal matter, "masterminded a plot to murder [Dr. Michael Weiss] in order to gain control of the proceeds of [his] $1,500,000 life insurance policy, for which she was named the irrevocable trustee" and possibly custody of their child (Matter of Michael Evan W. v Pamela Lyn B., 152 AD3d 414, 415 [1st Dept 2017], lv denied 30 NY3d 910 [2018]) Family Court granted the child's father - Weiss - custody of the parties' son, issued an order of protection against Buchbinder in favor of the child, and denied her supervised visitation with the child.
Buchbinder and Weiss, both psychiatrists by profession, and who were never married, had their only child in 2008. Weiss operated his medical practice out of his office-apartment in the Upper West Side of Manhattan. After the child was born, they continued to reside together until July 2009, at which point Buchbinder and the child moved to another apartment. Buchbinder closed her medical office after the attempted murder plot on Weiss.
In 2011, the parties commenced proceedings to determine custody and visitation. On July 18, 2012, the parties entered into a so-ordered custody and visitation agreement. Pursuant to the 2012 custody agreement, the parties shared joint legal custody, with Buchbinder retaining residential custody, and Weiss having regular parenting time including one overnight each week and time every other weekend. The parties contemporaneously entered into a so-ordered stipulation regarding child support, which, inter alia, required the father to maintain a $1,500,000 life insurance policy naming the child as irrevocable beneficiary and Buchbinder as irrevocable trustee. The policy was subsequently purchased.
According to Weiss's testimony in Family Court, and at a later criminal trial (see People v Nolan, 159 AD3d 455 [1st Dept 2018]), on November 12, 2012, following his overnight visitation with the child, he dropped the child off at daycare and returned to his home office for a therapy session with a patient. Shortly after the appointment began, Jacob Nolan - Buchbinder's 20-year-old cousin - barged in unannounced carrying a duffel bag, and Weiss escorted him out.
After his appointment ended, Weiss spoke with Nolan, who was loitering in the stairwell. Nolan told him that he had come to pick up a hard copy of the child's financial aid documents for preschool. Once in the apartment, Nolan asked to use the bathroom. Weiss asked Nolan to leave the duffel bag in the hallway because he was concerned that Nolan may have had equipment in the bag that he might use to "bug" the apartment at Buchbinder's request, as she had already made many recordings of their phone conversations.
While Weiss was retrieving the requested documents, Nolan emerged wielding a 10-pound sledgehammer, and struck Weiss in the shoulder as Weiss screamed for help. Nolan then dropped the sledgehammer, pulled out a knife and stabbed Weiss seven or eight times. Weiss was stabbed in the arms, legs, back, chest and abdomen. Weiss managed to wrestle the knife away and stabbed Nolan above the collarbone. He recognized that the knife was the same as one he purchased for Buchbinder when they were living together.
Nolan fled into the building's hallway while Weiss continued to call for help. Weiss, [*3]injured and bleeding, managed to crawl into the hallway where building staff, accompanied by responding police officers, discovered him. Nolan was also found in the hallway using his phone and "urgently" trying to get in touch with someone. As a result of the attack, Weiss suffered permanent scars on his arms, legs, back, and abdomen, which he showed to the jury at Nolan's criminal trial.
Nolan was arrested at the scene, and police recovered the knife, sledgehammer and duffel bag, which contained cigarettes, plastic zip ties, a white plastic bag with a Home Depot logo on it, two pillows, and a map of Weiss's building with its two different entrances noted, with lines drawn to show how to get from one side of the lobby to the other, and the location of Weiss's apartment.
Surveillance video from the West 23rd Street Home Depot showed Nolan and Buchbinder inside the store on the night of November 11, 2012, purchasing the zip ties and sledgehammer, for which Buchbinder paid cash. An officer involved in the investigation testified that upon a search of Buchbinder's apartment, the knife recovered appeared to be missing from a set of similar knives. A handwriting expert also concluded that Buchbinder drew the map recovered from Nolan. Cell phone records showed that Buchbinder and Nolan exchanged calls on the day of the attack.
In the Family Court proceeding, the court found that Weiss had proved by a preponderance of the evidence that Buchbinder had conspired to kill him, that she therefore committed various family offenses against Weiss, and that such aggravating circumstances involved warranted a five year order of protection against Buchbinder in favor of Weiss and his son. Family Court also denied Buchbinder any visitation with the child, based on the foregoing evidence and in light of Buchbinder's decision to invoke her Fifth Amendment right not to testify, from which the court took the strongest negative inference. This Court affirmed the Family Court's order (see Michael Evan W., 152 AD3d at 414).
Following Nolan's criminal trial, a jury convicted him of attempted murder in the second degree, two counts of burglary in the first degree, and attempted assault in the first and second degrees, and he was sentenced to an aggregate prison term of nine and one-half years to be followed by five years of post-release supervision. This Court affirmed the judgment of conviction (159 AD3d at 455).
On September 19, 2017, Buchbinder was charged with attempted murder in the second degree, burglary in the first degree (two counts), and attempted assault in the second degree, based on the same incident. She was arrested in Fayetteville, New York, a suburb of Syracuse, on October 19, 2017.
On October 20, 2017, Buchbinder pleaded not guilty before Justice Thomas Farber, who had presided over Nolan's trial and sentencing. The People argued that no bail could guarantee petitioner's return to court. The People asserted that Buchbinder had resided at several Manhattan addresses over the years, but those were determined not to be current. While she had been a psychiatrist practicing in Manhattan, she had closed her practice.
The People conceded that there were offers by counsel to surrender Buchbinder. However, the People noted that in attempting to locate her for the last three weeks, her phone was used in various locations in Massachusetts and Fayetteville,
New York. The People added that when she was arrested, her passport, effective until November 2017, was found on her person, and she also possessed her child's recently expired passport.
The People contended that Buchbinder had a clear motive to kill Dr. Weiss, since she "hated" him "because of their relationship," and his death would give her exclusive control of the proceeds of the $1.5 million in life insurance.
The People submitted the hand-drawn map showing how to enter Weiss's building, which, as noted, was found in Nolan's bag. The People argued that Nolan was able to obtain [*4]access to the building by asking for "Bright Kids New York City," a commercial establishment located in the building which was also written on the map. The People remarked that if only Nolan had been competent at wielding a knife while swinging the 10-pound hammer he had purchased with Buchbinder, Buchbinder would have been charged with murder. The People also asserted that Nolan had no motive to harm Dr. Weiss, other than to satisfy Buchbinder.
Moreover, the People argued that Buchbinder's "character" as the person posting bail was a relevant factor. In addition to the alleged attempted murder, the People relied on this Court's other findings in the Family Court case that "testimony demonstrated that [petitioner] sought to alienate the child from the father, falsely claiming that the father was trying to put her in jail, and pressing the child for personal details about the father's life" (see Michael Evan W., 152 AD3d at 415).
Buchbinder's counsel argued that he had met with four ADAs and said he would produce his client to the police. Counsel stated that there was not even a "gesture" at accepting this offer; instead, the police, using phone records, found out that she was staying with friends and arrested her in the Syracuse area. Counsel also noted that petitioner had offered a $1 million bond, to be secured by her mother's home in Florida, which had $1.6 million in equity.
Counsel also argued that petitioner's passport did not establish a flight risk, since she had not traveled out of the country in the past five years and made no attempts to flee after the incident. Regarding Buchbinder's character as the person posting bail, counsel noted that she had no prior convictions, had never missed a court date, and had never violated the order of protection requiring her to stay away from her child or otherwise been held in contempt of court.
In addition, counsel remarked that no efforts were made to revoke her license as a psychiatrist, allowing her to prescribe "narcotics." Instead, she was compelled to close her practice because of negative publicity arising from Nolan's trial.
Counsel further argued that it would be unfair to remand her based on evidence from Nolan's trial and the Family Court proceeding, since she had no opportunity to tell her story in Nolan's trial, and pleaded the Fifth in Family Court on the advice of counsel.
The bail court denied petitioner's bail application, holding that any bail in this case would be inappropriate. The court stated:
"I did try ... the case of [Jacob] Nolan. So, I am intimately familiar with the factors alleged by the People. I also realize, as [Buchbinder's counsel] said, that in the case that was tried against Mr. Nolan, not to any fault of the People's, Mr. Nolan's lawyers took the position that he had been manipulated by [petitioner].
"So, ... I have not heard [petitioner]'s side of the story. I'm not obviously commenting on the presumption of innocence. Of course, she's presumed innocent.
"This is in essence a murder case. It is only ... by dumb luck in this case that Mr. Weiss survived. He was stabbed within an inch of his life, brutally attacked with a sledge hammer. There may well be an explanation for this, but [petitioner] is on video ... buying ... the sledge hammer."
On or about October 30, 2017, Buchbinder sought a writ of habeas corpus, arguing, among other things, that her offers to turn herself in to the police had been ignored or rebuffed. She argued that her residences outside Manhattan did not set her apart from many other ordinary New Yorkers; and that she had possessed her child's expired passport, which would not have assisted her flight, merely for the sentimental value of her child's photo after losing custody. She stressed that she was a medical doctor in New York with no criminal record.
The People responded that, in addition to the foregoing allegations, Detective Kevin [*5]Buehler had visited some of Buchbinder's addresses obtained through a computer check, including 450 West 17th Street, 500 West 30th Street, 177 Prince Street, and 26 West 9th Street, and determined that she did not reside at any of them. Buchbinder was subsequently believed to live in Cambridge, Massachusetts.
When Buchbinder was arrested, she told Detective Buehler that she lived at 26 West 9th Street in Manhattan, but when Buehler said he had found otherwise upon visiting that address, she said that she lived at 41 West 19th Street.
The habeas court denied the application on or about November 3, 2017. The court noted that Justice Farber was very familiar with the Nolan case, having presided over the trial recently in 2016. The court noted that the People established their case beyond a reasonable doubt by presenting detailed evidence including the video, the sledgehammer, the map, and the motive. As to Buchbinder's character, the court cited this Court's findings in the Family Court case.
In addition, the habeas court stated that Buchbinder was not working since her psychiatric practice had closed, yet she was able to post $1 million secured by $1.6 million of real estate since she was from a wealthy family and her mother was willing to offer her Florida home as security. The habeas court noted that Buchbinder's multiple addresses were not current, and she was arrested in a suburb of Syracuse. As to the likelihood that Buchbinder would flee, the court noted that she possessed a valid passport and her child's expired passport.
The court also pointed out that the bail court "was aware she had no priors, and even though it may not have been totally accurate, ... was told ... that she had never missed a date in the Family Court proceeding."
The habeas court concluded that Judge Farber based on the evidence presented did not abuse his discretion in deciding that no amount of bail would secure the presence of petitioner for trial.
Thereafter, by letter dated November 13, 2017, petitioner sought to reargue bail by offering new conditions, namely a $1.5 million bond and electronic monitoring with real-time GPS tracking of all [her] movements.
At a November 14, 2017 conference, Justice Farber stated:
"Quite frankly, at this point I'm not going to reconsider bail. I may at a future date after I read the Grand Jury minutes, after I consider everything else, but at this stage, I just made my ruling on the application. Nothing in this letter, including an increased bail package and the additional monitoring[,] changes my view of it. My view of it, at this point, is that this is, in essence, a homicide case and that there's really no amount of bail that would be sufficient to prevent somebody in Ms. Buchbinder's situation from fleeing."
Counsel advised the court of a note by Nolan, handwritten within 24 hours after the incident, stating that Buchbinder had "nothing to do with this," but the court responded that there were other statements from him that implicated her. The court explained:
"Look, I tried the first case, and I don't want to say anything that's going to let anybody think that I've prejudged the case, but I'm very familiar with the evidence in the case. Things have a way of changing over the course of a case. If I view the case differently at some later point, I will reconsider bail and let you know. ... But at this stage, that does not make any difference to me."
The People then noted, as to the flight risk, that Buchbinder had not only her passport but also her birth certificate on her when she was arrested in Fayetteville, which is about a two-hour drive from Canada. The People also clarified that Buchbinder had failed to appear in court five times in a child support proceeding.
On or about November 21, 2017, counsel filed a second petition for a writ of habeas corpus, arguing that Justice Farber improperly declined to reconsider the request for bail on November 14, even after Buchbinder proposed more stringent conditions including electronic [*6]ankle-bracelet monitoring with real-time GPS tracking of all her movements, at her own expense, as well as a $1.5 million bond fully secured by her mother's Florida home, in contrast with her previous offer of a $1 bond with no electronic monitoring.
The habeas court denied the second habeas application on November 27, 2017. In this regard, the court stated that Judge Farber's ruling on November 14th was not a de novo bail determination but rather, a denial of petitioner's application to reargue a bail application. Further, the court found that petitioner's offer of a larger bail package with Nolan's note did not constitute an actual change in circumstance and concluded that Judge Farber did not abuse his discretion to not revisit bail.
Finally, the court said:"Judge Farber['s] ... discussion of flight on November 14th was with respect to the discrete issue of whether there was evidence that the petitioner had been attempting to or was planning to flee. He stated ... that his prior remand determination was not based on allegations of actual flight but rather, the other factors as referenced in CPL 510.30."
On appeal, Buchbinder contends that her two habeas applications should have been granted, since the bail court abused its discretion in denying her applications for bail. We find that the habeas court in each proceeding properly found that the bail court did not abuse its discretion in denying bail pending trial.
It is well established that "[t]he action of the bail-fixing court is nonappealable, but may be reviewed in a habeas corpus proceeding if it appears that the constitutional or statutory standards inhibiting excessive bail or the arbitrary refusal of bail are violated" (People ex rel. Rosenthal v Wolfson, 48 NY2d 230, 232 [1979] [internal quotation marks omitted]). Further, "the function of the habeas corpus court is one of collateral review of the determination of the nisi prius court; it is a second stage re-examination. The habeas corpus court is not to examine the bail question afresh or to make a de novo determination of bail" (id. [internal quotation marks omitted]).
Thus, "the habeas court[ s review] must of necessity be limited to consideration of the propriety of [the bail court's] determination in the light of the record on which it was made" (id. at 232-233). In other words, "[t]he scope of inquiry is whether or not the bail court abused its discretion by denying bail without reason or for reasons insufficient in law" (People ex rel. Kuby v Merritt, 96 AD3d 607, 608 [1st Dept 2012], lv denied 19 NY3d 813 [2012]; see People ex rel. Hunt v Warden of Rikers Is. Correctional Facility, 161 AD2d 475 [1990], lv denied 76 NY2d 703 [1990]). And, where the record shows that the bail court considered the factors enumerated in CPL 510.30(2)(a) and the "denial is supported by the record, it is an exercise of discretion resting on a rational basis and thus beyond correction in habeas corpus" (People ex rel. Parker v [*7]Hasenauer, 62 NY2d 777, 778-779 [1984]).
In fixing bail, "the court must consider the kind and degree of control or restriction that is necessary to secure [the defendant's] court attendance when required" (CPL 510.30[2][a]). That determination should be "informed by," among other things, the "defendant's character and reputation, employment and financial resources, family ties and length of residence in the community, prior criminal record[,] attendance record in prior proceedings" (Matter of Restaino, 10 NY3d 577, 583 n 3 [2008]), likelihood of conviction (see CPL 510.30[2][a][viii]), and potential sentencing exposure (see CPL 510.30[2][a][ix]).
Applying those principles, we find that the habeas court in the first proceeding correctly found that Justice Farber did not abuse his discretion in denying petitioner's initial bail application. The denial of bail was amply supported by the seriousness of the charges including attempted murder, the potential sentence of at least 5 years and up to 25 years in prison for the class B violent felonies of attempted murder in the second degree or first-degree burglary (see Penal Law §§ 70.02[1][a], [3][a], 110.10, 125.25, 140.30), as well as the strength of the evidence. Notably, Justice Farber had just presided over Nolan's trial for carrying out the plot allegedly orchestrated by petitioner (see People ex rel. Kirshbaum v Schriro, 100 AD3d 571, 571 [1st Dept 2012] [bail court providently exercised its discretion in denying bail pending second trial, having presided over first trial, "at which defendant was convicted of serious charges"]).
To the extent Buchbinder argues that the court improperly focused on the seriousness of the charges and the sentencing exposure to the exclusion of other factors, the court's failure to explicitly address each statutory factor or every specific argument raised by the parties on the record does not establish that the court abused its discretion. The court implicitly based its ruling on all of the parties' arguments (see id.).
In addition, the bail court's ruling was supported by circumstances demonstrating a serious flight risk. In particular, Buchbinder no longer had any significant ties to New York City and had closed her psychiatric practice here. She had apparently been living in various places in Massachusetts and New York, and was arrested in Fayetteville, a suburb of Syracuse about a two-hour drive away from the Canadian border. It was reasonable to conclude that offering to secure her bond with her mother's home in Florida would not prevent Buchbinder, who is now 48 years old, from fleeing the country while facing charges that could lead to a 25-year prison sentence, potentially resulting in her incarceration well into her 70s.
Buchbinder argues that she had not fled the country in the years between the offense and her arrest, which was close to the expiration of the five-year statute of limitations for attempted murder (see CPL 30.10[2][b]), and that her counsel offered to arrange for petitioner to turn herself in to the police. Counsel argued to the bail court that the authorities irrationally wasted taxpayers' money by continuing to surveil her after her attorney had made this offer. However, the authorities presumably had good reason to be skeptical of whether Buchbinder, who had allegedly tried to kill her child's father, would actually cooperate or would flee as soon as she received word that the authorities had accepted her offer and planned to arrest her soon.
Buchbinder asserts that the denial of bail contradicted Justice Farber's own finding that she did not pose a flight risk. However, this is based on a misreading of the record. Justice Farber's statement that he had not "seen compelling evidence [petitioner] was actually intending to flee," which "was not part of [his] decision," did indicate that he was not entirely convinced of the People's argument that petitioner was carrying a passport in the Syracuse area because she planned an imminent flight to Canada. But, Justice Farber's conclusion that no bail would be "sufficient to prevent somebody in Ms. Buchbinder's situation from fleeing" demonstrates that Justice Farber had more broadly found a high risk of flight in light of all the circumstances discussed above.
Buchbinder attempts to downplay the seriousness of the crime by noting that the victim [*8]stayed overnight in a hospital for only one night, and argues that this shows that there was no intent to kill. However, we find this argument unavailing. Buchbinder also contends that Nolan was convicted based on direct evidence of his attack against Dr. Weiss, which does not show that there is strong evidence of petitioner's guilt. However, this ignores the circumstantial evidence that Nolan carried out the attack at the behest of Buchbinder, who had a strong motive based on Weiss's life insurance policy and her desire for custody of their child. This evidence includes, as this Court found prior to any of the decisions at issue here, surveillance footage of Buchbinder and Nolan buying the sledgehammer Nolan used to attack Weiss, that the knife wielded by Nolan came from Buchbinder's apartment, that she and Nolan spoke on the day of the incident, and that the hand-drawn map found in Nolan's bag was found to be in Buchbinder's handwriting (see Michael Evan W., 152 AD3d at 415).
Buchbinder separately notes that Nolan was convicted based on his confession, which implicated her but which could not be admitted against her without violating her confrontation rights (see Bruton v United States, 391 US 123 [1968]). However, Justice Farber emphasized that Buchbinder was presumed innocent, and that he had not yet heard her case. Thus, the bail court did not improperly hold Nolan's guilt against Buchbinder without regard to the potential for different evidence to be presented at or precluded from her trial.
We also find that the habeas court in the second proceeding properly found that Justice Farber did not abuse his discretion in denying the application to reargue bail on new conditions. The habeas court properly found that insofar as Justice Farber denied the renewed bail application on the merits rather than as procedurally barred by the prior denial of bail, Justice Farber properly exercised his discretion.
Contrary to Buchbinder's contention, she was not entitled to have the court accept her renewed bail offer simply because she agreed to enhanced security measures and to put up more money. In People ex. rel. Kuby v Merritt (96 AD3d 607 [1st Dept 2012], lv denied 19 NY3d 813 [2012], supra), we found that the habeas court properly found the bail court did not abuse its discretion when it denied a renewed bail application which proposed a significant cash bond and electronic monitoring.
Specifically, in Kuby the defendant Gigi Jordan was charged with second-degree murder based on her suicide note stating that she had killed her eight-year-old son in order to protect the child from his abusive father. After Jordan's initial offer of a $5 million bond was denied, she proposed an enhanced security package in which the bond would be fully secured by her New York City properties. In addition, her approximately $40 million in assets would be frozen, "she would be confined to her Manhattan brownstone and monitored round the clock by on-premises armed security guards and an electronic G.P.S. system, at her own expense," and she would be required to continue psychiatric treatment (id. at 608). In affirming the denial of Jordan's habeas application challenging the denial of her renewed bail offer, this Court noted that while petitioner was an "accomplished" and wealthy person, she had, as in this case, "moved around repeatedly" (id. at 610). As is relevant here, this Court also held:
"Petitioner's position, if accepted, would mandate that bail be granted in every case in which the accused has the financial resources to offer private security and monitoring, thereby depriving the court of its discretion to grant or deny bail on consideration of the factors enumerated in CPL 510.30(2)(a). While petitioner claims that her security package is foolproof and trumps all other factors, the fact remains that no ad hoc arrangement based on keeping a defendant in her private home under the watch of a security firm that she hired could be as secure as remand" (id. at 610).
As in Kuby, the bail court here providently exercised its discretion in adhering to its remand decision notwithstanding the offer of ankle bracelet monitoring and additional money. Indeed, here the record supports the bail court's rational finding that the seriousness of the charges, the likelihood of conviction and lengthy sentence, and the risk of flight, as well as financial resources that could be used to facilitate flight, militated against setting bail, and outweigh the security package offered by Buchbinder.
In sum, both denials of bail were based on a proper consideration of the statutory factors relevant to determining "the kind and degree of control or restriction ... necessary to secure [petitioner's] court attendance when required" (CPL 510.30[2][a]), and there was no abuse of discretion by the bail court.
Accordingly, the judgment of the Supreme Court, New York County (Roger S. Hayes, J.), entered on or about November 3, 2017, denying a writ of habeas corpus and dismissing the petition, and the judgment of the same court (A. Kirke Bartley, Jr., J.), entered November 27, 2017, denying a subsequent application for a writ of habeas corpus and dismissing the petition, should be affirmed, without costs.
All concur.
Judgment, Supreme Court, New York County (Roger S. Hayes, J.), entered on or about November 3, 2017, and judgment, same court (A. Kirke Bartley, Jr., J.), entered November 27, 2017, affirmed, without costs.
Opinion by Tom, J. All concur.
Acosta, P.J., Manzanet-Daniels, Tom, Mazzarelli, Moulton, JJ.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: SEPTEMBER 25, 2018
CLERK